EVE v. UNION CENT. LIFE INS. CO. et al.—167 S. W. (2d) 8.

Middle Section. August 1, 1942.

Petition for Certiorari denied by Supreme Court, December 19, 1942.

2

Walker & Hooker and Albert Akers, all of Nashville, for appellants.

Tyne, Peebles, Henry & Tyne and Thomas G. Watkins, all of Nashville, for appellee.

HOWELL, J. The bill in this case was filed by Duncan Eve, Jr., against the defendant Union Central Life Insurance Company, and J. Byron Martin, as General Agent for the Company, and seeks to have delivered up and cancelled and for nothing held, two notes with complainant's name signed to them, alleging that the complainant does not owe defendants any sum whatever and that these notes were fraudulently secured from him by an agent for the defendant company who had defaulted and committed suicide upon his default becoming known.

The case was tried by the Chancellor and a jury, the issues were found in favor of the complainant and the Chancellor granted the relief prayed.

Motions for a new trial and for a finding for the defendants notwithstanding the verdict of the jury were overruled and an appeal prayed, granted and perfected to this Court.

The defendants have filed seventy-four assignments of error all of which will be considered together and the questions raised discussed.

The material facts in substance are:

The complainant, Dr. Duncan Eve, Jr., a surgeon of high standing and excellent reputation, who has been practicing his profession in Nashville since 1904, applied for and had issued to him policies of life insurance by the defendant Insurance Company. His first policy was for $10,000 and was issued in March, 1926, and the annual premium was $391.50. In July 1927, another policy was issued to him for $10,000 and the premium was $683.30. The complainant and his partners, Drs. Lucius and John Burch, practicing under the name of the Eve-Burch Clinic, in 1929, had issued to them by the defendant company a group policy in the amount of $20,000. Later, in 1933 another policy for $5,000 was issued to complainant,

the quarterly premium on which was $36.90. These policies were all issued at the solicitation of Andrew J. Zeitler, an agent for the defendant company and an intimate friend of the complainant since 1918, and to whom complainant gave all of his insurance, automobile, fire and life. The families of complainant and Zeitler were close friends and visited each other frequently. Dr. Eve had been the Zeitler family doctor and made no charge for his services. Zeitler had the absolute confidence of the complainant who trusted him implicitly.

About 1926, Zeitler became connected with the defendant company as agent and remained so connected until three or four days before he took his own life in 1939. Up to that time the representatives of the defendant company and especially J. Byron Martin who had for many years been the manager of the local office of the company, had full confidence in the honesty and integrity of Zeitler.

All of the dealings of every kind that the complainant had with the company were through Zeitler. From the time the first policy was issued until his death, Zeitler called at complainant's office regularly, he accepted notes for premiums, collected on the notes, accepted checks, acepted payments on notes and took renewals. This course of dealing continued from 1926 until 1939, and the manner in which the complainant's premium payments were being handled by Zeitler was well known to the local manager and officers of the defendant company. For some years when Zeitler would collect monthly payments from complainant, he turned such payments over to the local manager's office and it in turn remitted to the home office of the defendant in Cincinnati.

It was the custom of Zeitler to have the complainant sign premium notes and as Zeitler did not know the actual

amount of the balance due and interest to insert in the face of the notes, he asked the complainant to sign notes with the amount blank saying he would fill this in at the office. Payments were regularly made by the complainant every month, Zeitler calling at his office to collect between the first and fifth of the month. From the beginning of his dealings with Zeitler, the complainant in most instances made his checks payable to him but did make several of the early payments to the company. In 1936 or 1937, Zeitler represented to complainant that it would be a favor to him for the payments to be made always to him as he would get a little more out of it, and complainant readily acceded to this request. For years the checks payable to Zeitler when returned to complainant by his bank, bore the endorsements of Zeitler, J. Byron Martin Manager and the Union Central Life Insurance Company, or sometimes only two of the three.

Later Zeitler began the practice of retaining these payments for his own use and failed to remit to the company. When the notes for the annual premiums would fall due Zeitler would, as theretofore, go by the complainant's office, have him sign the notes with the amounts blank, and then fill in afterwards as the amount of the note, what was due for the previous years, with the next year's premium added, thus pyramiding the notes without the knowledge of or notice to the complainant.

The two notes sought to be cancelled and which are held by the defendant were acquired in this manner and are for the amounts of $2,259.30 and $6,392.80, respectively. The bill also prayed for a reference to the Master to determine the status of the account between the parties and for general relief.

It was insisted for the defendants that informatory notices as to premiums and amounts due on notes

were mailed to the complainant regularly, and the complainant denies that he ever received any of such notices except one in 1937, and says that this notice indicated that he owed an amount in excess of the annual premiums. He called Zeitler's attention to this and was told that it was a mistake made by some one in the office and he would attend to it. Complainant also received another notice in 1939 which indicated that he was indebted to the company in a large amount for premiums, and not being able to locate Zeitler he saw the defendant Manager J. Byron Martin, and in this manner Zeitler's unfaithfulness was discovered as a result of which he committed suicide.

The following issues of fact were submitted to the jury and answers were made thereto as shown:

"1. Did either informatory notices from the home office of the defendant company, or notices of maturity of the notes in question, from the office of J. Byron Martin, Manager of the company in Nashville (other than the notices of 1937 and 1939, which complainant states he did receive), reach the office of complainant, Dr. Duncan Eve, Jr., where he could have seen them by the exercise of reasonable care. Answer: No.

"2. Did complainant, Dr. Duncan Eve, Jr., actually see said notices other than the one in 1937 and the one in 1939, which he states he saw? Answer: No.

"3. Did defendant, J. Byron Martin, expressly authorize A. J. Zeitler to collect payments on notes given for premiums, from complainant Duncan Eve, Jr., without requiring said Zeitler to have in his possession the original notes? Answer: Yes.

"4. Did A. J. Zeitler claim or assert authority as agent of Union Central Life Insurance Company, to col-

lect such payments without having the original notes in his possession? Answer: Yes.

"5. If your answer to question No. 4 is 'yes', did defendant, Union Central Life Insurance Company or defendant, J. Byron Martin, manager, hold said Zeitler out, or by the want of ordinary care, or knowingly, allow him to hold himself out to Dr. Eve as possessing such authority? Answer: Yes.

"6. Did Dr. Eve believe, and in good faith have reason to believe that Zeitler possessed such authority? Answer: Yes."

From the record we are of the opinion that the jury were amply justified in making these answers to the isues submitted to them. We do not deem it necessary to discuss the testimony of the various witnesses.

In the contract of employment between Zeitler and the defendant company, Zeitler is designated as "General Agent", and the contract gives the company a lien on all commissions payable to Zeitler to secure any indebtedness due by him to the Managers or to the company, and also provides for a bond to be executed by Zeitler to the company and that he should be governed by all rules in the agent's manual and all instructions given him by the company or by its Managers. J. Byron Martin testified that the company had waived the provision of the contract as to a bond. The contract also provided:

"Reports—That he will keep an accurate record of all transactions on behalf of the party of the first part, and once a week, or as often as required, make to the party of the first part a full itemized report of all collections."

And also: "Collection—That he will immediately turn over any moneys collected to the party of the first part, or will immediately deposit the same to the credit of and

without expense to the party of the party of the first part, in such banks as may be designated by said first party."

Article 13 of the contract provides that Zeitler's records should be open for the inspection of the Company and article 15 required Zeitler to write $100,000 of insurance annually.

Zeitler began his practice of not turning over collections to the company and pyramiding the notes about 1933 and kept it up until his death in 1939.

J. Byron Martin, the Manager of the company knew of Zeitler's dealings with the complainant and that he was collecting these premiums and payments on notes monthly, and for a long time remittances were made to the company, and the manager and officials knew that none of these notes were in Zeitler's possession at the time collections were made. The complainant never at any time from 1926 to 1939, conducted any of his transactions with the Company through any one else than Zeitler.

In 1907 legislation in regard to insurance agents was passed by the General Assembly and Section 6087 of the Code of Tennessee is as follows: "Solicitors are agents of the insurer; fire insurance brokers excepted.—Any person who shall solicit an application for insurance shall in all matters relating to such application and the policy issued in consequence thereof be regarded as an agent of the company issuing the policy, and not the agent of the insured, and all provisions in the application and policy to the contrary are void and of no effect whatever; but this section shall not apply to licensed fire insurance brokers."

It is insisted for the defendant that Zeitler had no authority to make any collections from the complainant

unless he had the notes or receipts for the premiums in his possession, and that "Zeitler's authority was confined strictly to the solicitation of applications for life insurance and that unless specially authorized in writing to collect a particular premium Zeitler was without right to receive a premium." Brief page 145.

In 1903 the Supreme Court in the case of Ætna. Life Insurance Co. v. Fallow, 110 Tenn., 720, 77 S. W., 937, 940, said among other things: "The authorities are numerous in support of the general proposition that an agent of an insurance company, having ostensible general authority to solicit applications and make contracts for insurance, and to receive first premiums, binds his principal by any acts or contracts within the general scope of his apparent authority, notwithstanding an actual excess of authority."

Without quoting at length from this opinion we refer to the third, fourth and fifth syllabi which are as follows:

"General agent of, may waive conditions in a policy, when.

"It is well settled in this State that a general agent of an insurance company may waive conditions in the policy and that a company will be estopped to insist upon them in the enforcement of forfeiture, when such agent acts within the apparent scope of his employment as such agent of the company.

"Agent of, having ostensible general authority, binds principal, when.

"An agent of an insurance company, having ostensible general authority to solicit applications and make contracts for insurance, and to receive first premiums, binds his principal by any acts or contracts within the general scope of his apparent authority, notwithstanding the actual excess of authority. Such agent is presumed to

have full power to waive immediate payment of premiums, to make contracts for credit, to accept annual premiums, and to issue renewal receipts, thereby extending or renewing policies of insurance.

"Act of subagent employed to perform part of general agent's duty, binding on principal, when.

"It is well known that according to the ordinary course of business a general agent of an insurance company has the right to employ such clerks or subagents as may be necessary and proper in order to perform the business for which he has been appointed agent. And a subagent employed by a general agent and charged by him with the duty of performing some portion of the ordinary, usual and well-known duties pertaining to the position of general agent, has power to bind the principal when his act is in the course of that employment, and within the general scope of authority of such general agent."

Numerous authorities might be referred to.

It is insisted for the defendant that the complainant cannot be relieved of the payment of these notes because Zeitler never had possession of them. In the case of Conaway v. New York Life Insurance Company, in 171 Tenn., 290, on page 301, 102 S. W. (2d), 66, on page 70 et seq. the Supreme Court said:

"It is earnestly and ably argued (1) that not only was no authority in fact vested in the Turley Company to make a collection before maturity, but that the complainant was put on notice of this particular limitation of authority at the time; and (2) the insurance company invokes application of the rule announced in Griswold, etc., v. Davis, 125 Tenn., 223, 141 S. W., 205, followed in later cases, thus fairly stated in the headnote:

"'As a general rule the debtor is not justified in paying the principal debt to an agent of the holder who is

not expressly authorized to receive it, unless the agent, at the time of payment, has in his possession the securities paid, and makes that fact known to the debtor; and, if the person to whom payment is made is not in possession of the written securities, the burden is upon the debtor to show that the one to whom payment was made had special authority to receive payment, or that he was represented by the creditor to have such authority.'

"We have no purpose to depart from this rule, but this case is distinguishable in at least two material regards. . . .

"In this connection, we take from the opinion of the Court. of Appeals the following statement of the general rule, quoted from 2 C. J., under Agency, sec. 262, p. 625, as to the payment to an ostensible agent of the holder of negotiable paper, who does not have possession thereof at the time:

" 'The mere fact that the agent has not possession of the notes or securities at the time of payment is not conclusive that he has no authority to collect the same, but is only a circumstance to be considered in determining the question; and the facts and circumstances may be such that, notwithstanding the agent has not such possession, he has actual authority, express or implied, to make the collection. Thus where a principal by his habits and course of dealing has held an agent out as having general authority to make loans for him, and to receive payments on the same, he may be bound by payments to the agent, although the securities are not in the possession of the latter and although payments are accepted before maturity, or are made to one who has had actual authority which has been revoked, but without notice to the third person.' . . .

"We have here an apt illustration of the reason of the well-settled rule that 'the scope and extent of the agent's authority is to be decided from all the facts and circumstances in evidence, and is to be determined by the triers of the facts,' here the lower courts. And 'the apparent authority of an agent to act as the representative of his principal is also to be gathered from all the facts and circumstances in evidence, and ordinarily this is a fact for the jury's determination.' 2 Am. Jur., p. 360.

"These quotations from Mechem on Agency (2 Ed.), are expressive of general applicable principles:

"Section 1987: 'The principal may, either expressly or by implication, put the agent in such a position or charge him with such duties, that the making of representations will fall within the scope of his authority, as where, expressly or by implication, he refers persons to the agent for information or authorizes him to do acts to which the making of representations is a necessary or a usual incident.'

"Section 1990: 'The American cases have generally held the principal liable to innocent third persons where the representations was made in the course of the principal's business and apparently for his account and while the agent was acting within the general scope of his authority, even though in the particular case he was secretly abusing his authority and attempting to perpetrate a fraud upon his principal or some other person for his own ultimate benefit.' "

In Couch's Cyclopedia of Insurance Law, Vol. 3, paragraph 599, the rule is stated as follows: "In the absence of express and controlling contract or statutory provision, premiums or ordinary insurance policies may be paid to the company itself or to its authorized agent, since, if an agent has express, or is clothed with apparent,

authority to receive payment of premiums, payment thereof to him by insured is sufficient, and binds the insurer, even though the agent gives no receipt, and fails to remit or turn over the money to the insurance company, and whether or not such payment be in strict conformity with the terms of the contract, the important fact being the good-faith payment of the money. But payment of premiums by insured to its own agent or broker is not payment to the insurer, where the agent fails to pay the same over. If, however, brokers are the agents of the insurer for the purpose of collecting premiums, a payment to them is binding, even though they have failed to pay a number of premiums to the insurer. Under a statute declaring soliciting agents the agents of the insurer, one who solicited insurance, delivered the policy, and collected the first premium is, as to the attempted collection of other premiums, the agent of the company. And payment to the agent who solicited the insurance is payment to the insurer, where the statutes define a solicitor, or insurance solicitor, as one duly appointed and authorized by a duly commissioned agent to solicit, receive, and forward applications for insurance, and to collect premiums for the agent. Again, premiums may be paid to one intrusted by the company with the delivery of the policy, so as to make payment to him payment to the company, especially where the policy acknowledges receipt of the premium, since authority to deliver warrants the insured in relying on the implied authority of the agent to receive the premium, and this, according to some but not all, courts, although the policy provides otherwise, and notwithstanding the policy itself stipulates for payment at the home office. Again, payments to a local agent are sufficient where the company has received them without objection, or where such agent is

authorized to close the contract. So, payment may be made to the broker who negotiated the policy, he having accepted and retained the same, and where the agent directs such broker to hold the premium for a time and credit the company with the amount, charges the same to the broker, and transmits it to the company, it is a question for the jury whether payment has been made.''

In the case of Southern R. Co. v. Pickle, 138 Tenn., 238, on page 244, 197 S. W., 675, on page 677, the Supreme Court said: ''What is meant by the term 'apparent scope of an agent's authority,' in the abstract, is a question of law, a matter of definition, for the court. Whether facts testified to by witnesses in a given case exhibited a claim or assertion of authority, by one as the agent of another with the consent or through the sufferance of that other is a question of fact; also whether the power asserted by conduct is a reasonable inference from express powers proven; both matters for the jury.''

We are of the opinion that the Chancellor did not err in submitting the issues of fact in this case to the jury and was correct in overruling the defendants' motions, and the assignments of error in this regard are overruled.

It is insisted for the defendant that the Chancellor erred in reading to the jury at the beginning of the trial some proposed issues of fact filed by the complainant.

■ Before the introduction of any proof and after the reading of the pleadings the Chancellor said to the jury:

''Gentlemen of the Jury, in the trial of jury cases in the Chancery Court, the issues of fact to be submitted to the jury are to be made up by the parties under the direction of the court.

''In this case I will at this time read to you issues of fact that have been submitted by the complainant, and defendant not having submitted any issues of fact, and

taking the position that this is a case in which a jury trial is not necessary, and that the case will probably be determined on questions of law, largely, and in which a jury trial is perhaps not proper or necessary.

"In reading you these issues of fact, it is not to be understood that they are necessarily the issues that will finally be submitted to you for your determination. I read them to you at this time, largely in order to inform you as to the questions submitted by complainant, and that will probably be submitted for your determination. The Court, however, reserves the right to either consolidate these issues or to eliminate some of them, or decline to submit some of them. How this will be determined during the progress of the trial, you will be instructed at the conclusion of the proof just what the issues are."

He then read the proposed issues. After the proof was concluded the issues herein above set out were submitted to the jury.

We think this practice is entirely proper. The defendant had submitted no issues to the Court and this action of the Chancellor only pointed out to the jury matters that they might have been called upon to determine. Before hearing any proof in a case of this kind it frequently occurs that the Chancellor cannot determine just what issues should be submitted to the jury and must await the closing of the proof to decide what material issues are presented. We do not see how this action of the Chancellor could be construed as an error prejudicial to the defendant and this assignment is overruled.

 It is also insisted that it was error to permit testimony as to transactions between Zeitler and other policy holders of the company. This evidence was introduced for the purpose of showing that the defendant company and its Manager J. Byron Martin approved and acquiesed

in the manner in which Zeitler was transacting business for the company and made no objection or questioned it at any time, and tended to show further that they had authorized this method of dealing by Zeitler. We think such evidence was material and relevant to one of the main issues in the case, and these assignments are overruled.

It is assigned as error that the Court failed to charge the jury in regard to a presumption that the complainant received certain notices and the inferences to be drawn therefrom. The record does not disclose that any special requests were submitted to the Court and therefore this assignment must be overruled. Shelby County v. Fisher, 137 Tenn., 507, 194 S. W., 576; and Hemmer v. Tennessee Electric Power Co., 24 Tenn. App., 42, 47, 139 S. W. (2d), 698; Roller v. Bachman, 5 Lea, 153, 159.

Several assignments of error are directed at the argument of counsel. We have carefully read the argument as it appears in the transcript and see nothing improper in permitting counsel to call the attention of the jury to reasonable and justifiable inferences which may be drawn from the testimony of witnesses.

Since the Act of 1911, Section 10654 of the Code it must affirmatively appear that the error or improper argument affected the result of the trial. Thompson v. Trentham (Tenn. Sup.), 154 S. W. (2d), 792, 138 A. L. R., 461. Such does not appear here. These assignments are overruled.

It is also assigned as error that the Court should have granted defendant's motion to withdraw the issues from the jury and enter a decree for defendant because complainant is not "entitled to the benefit of payments which may have been made by him to Zeitler prior to February 21, 1934, the defendant having pleaded the

Statute of Limitations." Our attention is not called to any authorities to support this assignment and we do not understand that there is any Statute of Limitations which would prevent this complainant from asserting that he had paid his debt.

We have carefully considered all of the assignments of error and the briefs and argument of counsel and we concur in the findings of the Chancellor and are of the opinion that there is no error in the decree of the lower Court and that all the assignments should be overruled.

A decree will be entered here affirming the decree of the Chancellor and giving complainant Duncan Eve, Jr., a judgment against the defendant Union Central Life Insurance Company of Cincinnati, Ohio, for the sum of $213.70, and interest from November 7, 1941, and all the costs of the cause.

Felts, J., concurs.

Affirmed.