Boillin-Harrison Co. *v.* Lewis & Co.

(*Nashville*, December Term, 1944.)

Opinion filed March 5, 1945.

Rehearing denied May 5, 1945.

COLLIER GOODLETT, of Clarksville, and ROBERTS & ROBERTS, of Nashville, for Boillin-Harrison Co., respondent-complainant.

BASS, BERRY & SIMS, JUDSON HARWOOD and CARMACK COCHRAN, all of Nashville, for Lewis & Co., petitioner-defendant.

PER CURIAM.—A petition for *certiorari*, filed by Lewis & Company, complains of a decree of the Court of Appeals awarding a recovery against it in favor of Boillin-Harrison Company in the sum of $13,807.59 for breach of contract. The Chancellor had dismissed the bill.

After a thorough checking of the record and examination of authorities, we concur in both the conclusions and reasoning of the Court of Appeals, as set forth in an opinion by Presiding Judge Felts of that Court. The case is so fully and clearly stated in that opinion that this Court adopts and incorporates it in this opinion for publication. We quote:

"Boillin-Harrison Company was a wholesale dealer in groceries at Clarksville. Lewis & Company was a Kentucky corporation selling groceries as a broker and also to some extent for its own account, having offices in New York, Chicago, Louisville, Nashville and several other cities. In December, 1936, defendant, represented by B. M. Moore, Jr., its manager of its Nashville office, brought to complainant a written offer by Sterling Sugars Sales Corporation, of Louisiana, to sell 15,000 bags of sugar for future deliveries during the first half of 1937, and a like offer of Olavarria & Company, of New York, to sell 10,000 bags of sugar for deliveries from March through August, 1937. The price in both offers was $4.75 per bag plus freight. This quantity, 25,000 bags, 2,500,000

pounds was in excess of the needs of complainant, and it was unwilling to accept the offers.

"To induce complainant to accept them, defendant's agent Moore told complainant's representatives that defendant had contracted for great quantities of sugar for future deliveries to be spread through 1937 so that, by hedging on the New York Sugar Exchange to protect itself against price fluctuations during 1937, it could make the 25,000 bags of sugar in these two offers cost complainant only $4.40 per bag plus freight; that the rules of the exchange required defendant to use the names of its customers in doing the hedging, which was not a speculation but a 'perfect hedge' only to insure the price of $4.40 against fluctuations; and that if complainant would accept these offers and authorize the use of its name by defendant in doing the hedging, defendant would reduce the price of the 25,000 bags of sugar from $4.75 to $4.40 by reimbursing complainant for the difference 35 cents per bag. He also stated that Olavarria & Company was the same as Lobo & Company, through whom defendant would carry on the hedging, and that defendant would make the reimbursement to complainant through Lobo & Company.

"Complainant accepted this proposal of defendant and signed the two written offers, and defendant gave complainant a letter that day, December 28, 1936, which, omitting the letterhead of Lewis & Company, was as follows:

" 'December 28, 1936

" 'Boillin-Harrison Company,

" 'Clarksville, Tenn.

" 'Attention—Mr. Jos. A. Boillin

" 'Dear Mr. Boillin:

" 'It is understood and agreed that we are to reduce the contract price of 25,000 bags of sugar bought on contract for delivery during 1937 and which contracts are executed by Olavarria & Company and Sterling Sugar Sales, and that we are to reduce the contract price of your sugar to $4.40 net basis FOB refinery plus the actual rate to Clarksville, through the use of the Sugar Exchange and that you are to be reimbursed by Lobo & Company for the difference between your contract price and the price that the sugar is actually billed at. We are to have the privilege of using the Exchange in your own name for the reduction of these contracts.

" 'Yours very truly,

" 'Lewis & Company
" (Signed) " 'B. M. Moore, Jr.
" 'B. M. Moore, Jr.'

"Complainant received and paid for the 25,000 bags of sugar at $4.75 per bag plus carrying charges and certain overcharges for substitutions made by the sellers. Though the deliveries were to be spread from January through August, 1937, they were actually made between March 5 and April 5, 1937. When complainant received the invoices it asked that the refunds be made, but Moore explained that complainant would have to pay the full amount of the invoices and would be later reimbursed by defendant through Lobo & Company. He called at complainant's office on April 9, 1937, and asked it to give defendant written authority to use its name in the hedging, to buy or sell on the exchange not exceeding '25 lots,' a lot according to the usage of the exchange meaning 50 tons. Complainant handed him a letter which was as follows:

" 'April 9, 1937.

" 'Lewis and Company,

" 'Nashville, Tennessee

" 'Sirs:

" 'This is your authority to buy or sell for our account on the New York Sugar Exchánge not to exceed 25 lots.

" 'It is agreed that you are to advise us upon all such transactions as you make them.

" 'Yours truly,

" 'Boillin-Harrison Company.'

"After Moore left with this letter complainant's president, Mr. Joseph A. Boillin, and his son, reflecting that the letter did not express the contract, which was that the hedging would be at defendant's risk, rewrote the letter exactly as above quoted and added these words: 'and that any losses that may be incurred in these transactions are to be absorbed by Lewis & Company and not charged to us.' Next morning before defendant's office opened complainant's president delivered this letter, as rewritten, to Moore and requested him to substitute it for the first letter as authority for the hedging. Moore agreed to do this but, unknown to complainant, sent the first letter to the New York office of Lewis & Company where it was received and stamped 'Received Apr. 14, 1937 Lewis & Company, 120 Wall Street N. Y. O.' (see Ex. 9, dep. Joseph A. Boillin).

"From defendant's New York office this letter was delivered to Lobo & Company, a partnership whose members were members of the New York Sugar Exchange and also the officers and directors of Olavarria & Company, a New York Corporation. Lobo & Company 'received an order on April 20, through Lewis & Company to purchase 25 lots of September, 1937 sugar for the account' of complainant, based on the authority of the first

letter above quoted. This transaction was made by Lobo & Company as well as several other transactions on the exchange during the period from April 20 to September 23, 1937. It seems that the instructions to Lobo & Company for making these transactions were given by B. M. Moore, Jr., manager of defendant's Nashville office. As each transaction was made Lobo & Company sent the usual broker's notice to complainant.

"Understanding that these transactions were being made on the authority of its second letter, complainant forwarded these notices to defendant at its Nashville office for the attention of Moore, stating complainant's understanding that defendant was to look after the transactions and calling on defendant to begin making the reimbursements. Moore put off complainant on one pretext after another. The account was closed September, 1937 showing an indebtedness of complainant to Lobo & Company for $4211.84. Lobo & Company later sued complainant and obtained a decree for that amount, which complainant paid. By this suit complainant seeks to recover of defendant this $4211.84 and $9,595.55, the difference between $4.40 per bag and what complainant paid for the sugar, totaling $13,807.39.

"The defendant's answer averred these defenses: (1) Defendant's agent Moore was without authority to make the contract sued on; (2) the contract was without consideration; (3) it did not bind defendant to reimburse complainant but stated a third party, Lobo & Company, would do so; (4) the contract was conditional, the condition being that complainant's reimbursements would depend upon whether there was a profitable speculation on the sugar exchange; (5) the contract was illegal as contemplating a speculative or gambling transaction; and (6) it was also illegal as contemplating a

discriminatory rebate in violation of the Acts of Congress, the Clayton Act and the Robinson-Patman Act (sec. 13, title 15, U. S. C. A.), denouncing discriminations which lessen competition in interstate commerce.

"A large amount of proof was taken, most of which was directed to the issue of the agent's authority. The Chancellor filed a written opinion sustaining the defenses: (1) that the agent acted without authority, (2) that the contract was without consideration, and (3) that it violated the Clayton and Robinson-Patman Acts; and he accordingly dismissed the bill.

"Complainant appealed and has filed assignments of error challenging these conclusions of the Chancellor; and the defendant has also assigned errors upon the matters pretermitted by the Chancellor, insisting that he should have sustained these defenses.

"Thus the questions made before us are: (1) Whether the agent had authority to make the contract; (2) whether the contract was supported by sufficient consideration; (3) whether by its terms it bound defendant to reduce the price to $4.40 by reimbursing complainant for the difference; (4) whether it was an unconditional promise by defendant or was conditioned upon there being a profitable speculation on the sugar exchange; (5) whether the contract was illegal as contemplating a gambling tranaction; and (6) whether it violated the Acts of Congress referred to.

"(1) In respect of the question of the agent's authority, we find that the preponderance of the proof established these facts. As stated above, defendant was a corporation organized under the laws of Kentucky, with offices in New York, Chicago, Louisville, Cincinnati, Lexington, and Nashville. It domesticated in Tennessee March 30, 1936, and appointed B. M. Moore, Jr., as its agent for the

service of process upon it in Tennessee. Soon thereafter it established its office in Nashville and put Moore in charge as its manager. While its main business was as broker, it also dealt to some extent for its own account as principal. It is true that Lewis, defendant's president, testified that by its charter it had no power to deal except as broker and that it always acted as broker for others and never dealt for itself as principal. But the copy of its charter filed shows that it had the power to deal both as broker and as principal and the proof shows that it did this.

"Complainant's witness Cohen, a merchant at Pulaski, Tennessee, filed numerous paid checks and invoices showing defendant had sold him produce not as broker but as principal. He also filed a letter dated January 8, 1937, showing that defendant sold him 10,000 bags of sugar for future delivery, 5,000 of which it sold as broker for Sterling Sugar Sales Corporation and the balance of which it sold for its own account. In this sale defendant made a reimbursement agreement with him similar to that relied on by complainant in the present case. Defendant purchased the 5,000 bags of sugar from Olavarria & Company and had that company ship the sugar to Cohen.

"For defendant it is said that a reimbursement agreement like that here involved was so unusual and unheard of that no prudent merchant could reasonably have supposed that any broker would make such an agreement and that complainant's representatives should have known that it was beyond the authority of defendant's agent Moore to make the agreement sued on. The proof, however, shows that such an agreement was not unheard of, that in some instances other brokers made similar agreements with wholesalers in Tennessee, including complainant. While Moore was in charge of complain-

ant's Nashville office and during the latter half of 1936 and the first part of 1937 he was offering the same agreement he made with complainant to most of the leading wholesale merchants in Middle Tennessee. Indeed, it appears from the proof that he made several of such agreements with these wholesalers: Boillin-Harrison Company of Clarksville, Cohen & Sons of Pulaski, J. A. Sloan Company of Columbia, Jellico Grocery Company of Jellico, and Covington Brothers of Mayfield, Kentucky. By means of such agreements during this period defendant, through its agent Moore, sold these merchants more than 7,500,000 pounds of sugar for future deliveries to be spread from January through August, 1937.

"It is also urged for defendant that such a reimbursement contract by defendant was unreasonable on the face of it because a reimbursement of 35 cents per bag was six or seven times the amount of defendant's commission as broker. But this assumes that defendant was interested in these numerous transactions only as broker. If it was interested also as principal and had contracted for future deliveries of sugar, as Moore stated, so that by proper hedging it could make the price of $4.40 to these merchants, such an agreement was not unreasonable or unusual.

"These numerous other reimbursement contracts which Moore as defendant's Nashville manager made with these other wholesalers for future deliveries of sugar were the same as that made with complainant. In each instance the sugar was to be delivered by Sterling Sugars Sales Corporation or Olavarria & Company, and defendant agreed to reduce the invoice price of $4.70 or $4.80 to $4.40 by reimbursing the wholesaler for the difference, through Lobo & Company, the New York firm of brokers

handling the transactions on the New York Coffee and Sugar Exchange.

"L. S. Perry, vice president and a director of defendant, was the manager of its New York office, which had charge of all these Olavarria & Company sugar contracts. The correspondence between Perry and U. S. Jones of the Jellico Grocery Company shows that Perry knew Moore was making these reimbursement agreements, that Perry told Lewis, defendant's president, of this, and that defendant was reimbursing Jones on one of the contracts through Lobo & Company; and Jones' testimony shows that defendant reimbursed him on a contract made June 24, 1936, by Moore for defendant with Jones for the Jellico Grocery Company.

"With this knowledge and approved course of dealing, defendant kept Moore in charge of its Nashville office until September, 1937, through the period for delivery of all this sugar until the September sugar futures transactions were about to be closed by Lobo & Company on the sugar exchange.

"On September 3, 1937, Lewis, defendant's president, wrote complainant a letter stating that defendant had just received a copy of complainant's letter of August 31, addressed to defendant's Nashville office demanding the reimbursement. In this letter Lewis stated that defendant knew nothing about such a contract and Moore was not authorized to make the same. This, however, was after complainant had received and paid for all the sugar and just before the transaction on the sugar exchange was to be closed. How this letter of complainant of August 31, without any of the earlier correspondence between complainant and the manager of defendant's Nashville office, came to Lewis' attention, does not appear. But it does appear that he often visited the

354

Nashville office and went through the correspondence files and it was the custom of that office to send a copy of every letter to the Louisville office.

██ ''The Chancellor, while admitting evidence as to these other transactions of Moore, as defendant's Nashville manager, expressed the view that such evidence was immaterial to the issue of Moore's authority to make the contract with complainant. And defendant now insists that such evidence as to other transactions is immaterial and should be excluded. We think, however, that this evidence is competent and material as circumstances to prove the authority of defendant's agent Moore. It is conceded that his authority was oral and not evidenced by writing. The fact of actual agency may be established, like any other fact, by circumstantial evidence. *Kenner v. City National Bank*, 164 Tenn. 119, 135, 46 S. W. (2d) 46, 51.

██ ''The argument for defendant is that as complainant is not shown to have known of Moore's other transactions, it cannot rely on the evidence as to such transactions to show his authority. This would be true if it were sought to use such evidence to create apparent authority or agency by estoppel. But it is not true as to actual authority. If Moore had actual authority, complainant has a right to prove such authority by circumstantial evidence; and what he did, with the knowledge and approval of his principal, is circumstantial evidence of what he was authorized to do. The voluntary acquiescence of the principal in the known course of conduct of the agent may serve to show that such conduct was in fact authorized. This does not depend on estoppel but is an inference of fact to be drawn from conduct. It is, therefore, not essential, as in cases resting upon estoppel, that the other party shall have known of the facts at the

time and relied upon them, but he may, as in other cases of actual authority, prove the authority though he was ignorant of it at the time of the act. *Tennessee Products Corporation* v. *Broadway National Bank*, 25 Tenn. App. 405, 410, 158 S. W. (2d) 361, 364; 1 Mechem on Agency (2d Ed.), sec. 717, pp. 506, 507.

■ ''Upon full consideration of all the evidence, we think the circumstances here shown are sufficient to prove that defendant's agent Moore acted within his actual authority in making the contract with complainant here sued on. We reach this conclusion notwithstanding denials by defendant's officers that Moore had such authority and that they knew or approved the numerous other similar contracts made by Moore. We think the circumstances show that both Perry and Lewis knew and approved of Moore's course of dealing in respect of such contracts. As stated, the correspondence between Perry and Jones shows that Perry knew this and told Lewis, and such correspondence, together with testimony of Jones, shows that defendant did make reimbursement, similar to that here sued for, on one contract made June 24, 1936, by Moore with Jones and on another contract made between them dated December 17, 1936.

■ ''This proven knowledge and acquiescence, coupled with Moore's numerous continued transactions, covering a period of nearly a year, we think, established his authority in the numerous other instances as well as in the present one. A very general mode of establishing authority on the part of the agent to bind the principal is by proof of recognition by the principal of other similar acts and transactions performed by the agent. *Tennessee Products Corporation* v. *Broadway National Bank, supra;* 2 Am. Jur., Agency, sec. 449, p. 356; 3 C. J. S., Agency, sec. 328, pp. 307, 308; cf. *Conaway* v. *New York Life Ins.*

*Co. et al.*, 171 Tenn. 290, 102 S. W. (2d) 66; *Eve v. Union Cent. Life Ins. Co. et al.*, 26 Tenn. App. 1, 167 S. W. (2d) 8. In his excellent treatise on Agency, Mr. Mechem says:

" 'Section 263. By acquiescence in, or recognition of, similar acts.—So evidence of agency is also often found in the fact that the alleged principal has acquiesced in, recognized or adopted similar acts done on other occasions by the assumed agent (and the considerations will be similar to those dealt with in the preceding section.) Where the acts so adopted are so closely connected as to constitute a course of dealing, or to establish a custom, there can usually be but little difficulty.; neither can there be where the acts are so numerous or so closely related as to reasonably lead to no other conclusion than that of a general agency for the doing of acts of that character.' 1 Mechem on Agency (2d Ed.), sec. 263, pp. 188, 189.

"The American Law Institute in the Restatement of Agency expresses a similar view (Vol. 1, sec. 43):

" 'Section 43. Acquiescence by Principal in Agent's Conduct.

" '(1) Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance.

" '(2) Acquiescence by the principal in a series of acts by the agent indicates authorization to perform similar acts in the future.

" 'Comment:

" 'a. Persons ordinarily express dissent to acts done on their behalf which they have not authorized or of which they do not approve. If the agent has been previously authorized and the extent of his authority is un-

certain, the performance of acts by the agent which might reasonably be within the authorization and acquiescence therein by the principal, indicates that the parties understood that such acts were authorized, and the rule stated in Section 42 is applicable. If there was clearly no authorization to do the acts, the acquiescence by the principal indicates an affirmance which normally operates as ratification (see Section 94).'

"(2) The argument for defendant that there was no consideration for the contract here sued on undertakes to split up the transaction into four parts, the contract with Sterling Sugars Sales Corporation dated November 19, 1936, that with Olavarria & Company dated December 17, 1936, the letter of defendant of December 28, 1936, and complainant's letters of April 9, 1937; and it is insisted that defendant as broker had already sold the 25,000 bags of sugar to complainant, earned its commission from the sellers, and finished its part of the transaction, before the reimbursement agreement was made and the letters of April 9, 1937, were written; and that defendant received no consideration for such agreement.

"The proof, however, shows that it was all one transaction. These written offers had been previously dated by the sellers and sent to Moore, but they were not accepted by complainant until the 28th of December and were accepted then only upon the inducement by defendant's agreement to make the reimbursements and to conduct the hedging to protect itself to stabilize the price of $4.40 during the period for deliveries of the sugar. The proof leaves no doubt that complainant would not have bought any of the sugar but for defendant's contract, that the consideration for that contract was complainant's purchase of this enormous amount of 2,500,000 pounds of sugar for future deliveries, and that the letters of April

358

9, 1937, giving defendant authority to use its name in doing the hedging were merely in pursuance of the agreement to that effect which had been made on December 28, 1936. It needs no citation of authority for the proposition that complainant's purchase of this sugar was a sufficient consideration to support defendant's contract.

■ "(3) The insistence here is that defendant's letter of December 28, 1936, above quoted did not constitute a promise by it to reimburse complainant but was a mere statement that a third party would make such reimbursement. We cannot follow this argument. Whatever ambiguity there may be in that letter disappears when it is read in the light of the whole transaction, of the conversations of the parties and their prior and subsequent correspondence. So read, as it must be, it clearly shows that defendant undertook a definite obligation, which was to reduce the price from $4.75 to $4.40 by refunding the difference to complainant. It promised to make the refund through Lobo & Company merely because that company was to handle the hedging for defendant. But the fact that it stated that the refund was to come through Lobo & Company did not make it any less an obligation of defendant to make the reimbursement.

■ "(4) Nor do we think the contract of defendant to make the refund was conditioned upon there being a profitable speculation on the sugar exchange. That transaction was not to be a speculation but a hedging to stabilize the price of $4.40 against future fluctuations of the market. Hedging is a common and proper practice of millers, merchants, and other businessmen who must make contracts in view of the future needs of their business. It is neither immoral nor anti-social but has a definite place and performs a useful economic function in our system of production and distribution. If a merchant

buys today 10,000 pounds of sugar which he must sell six months hence; he has a very important and legitimate interest in protecting himself against losses due to fluctuation in the price of the sugar. Hedging affords such protection; it is in the nature of price insurance. The real difference between hedging and gambling is that the hedger has a legitimate interest to protect apart from the hedging transactions, while the gambler has no interest except in the transactions depending on the rise and fall of the market. An insurance contract becomes a wager when the insured has no legitimate interest to be protected against the happening of the event insured against. For an interesting discussion of the practice of hedging, see 'Hedging and Wagering on Produce Exchanges,' by Edwin W. Patterson, 40 Yale Law Journal 843-884. See also, 'Legislation Affecting Commodity and Stock Exchanges,' 45 Harvard Law Review 912-924.

 ''(5) Likewise, we think there is no ground for saying that the contract sued on was illegal as contemplating a gambling transaction. Defendant relies on our case of *Easterly* v. *Myers*, 24 Tenn. App. 688, 148 S. W. (2d) 640. That case, however, did not involve hedging. The transaction there was a pure wager on the rise and fall of the market by long and short selling of grain on margins by parties who were not engaged in the business of dealing in grain and who had no intention to make or accept deliveries.

''In *Palmer* v. *Love*, 18 Tenn. App. 579, 590, 80 S. W. (2d) 100, 106, we said: ' ''Hedging is lawful. It is recognized as a legitimate and useful method of insuring against loss on a contract for future delivery. A purchase or sale made as a hedge is none the less 'a serious business contract for a legitimate and useful purpose that it may be off-set before the time of delivery in case delivery

should not be needed or desired.' *Board of Trade of Chicago* v. *Christie [Grain, etc., Co.], supra,* 198 U. S. (236), 249, 25 S. Ct. 637, 639, 49 L. Ed. 1031.'' *Lyons Milling Co.* v. *Goffe & Carkener, supra* [8 Cir., 46 F. (2d) 241, 247, 83 A. L. R. 501].'

▪The burden of proving that a transaction is a wager rests on the party alleging it. *Palmer* v. *Love,* 18 Tenn. App. 579, 589, 80 S. W. (2d) 100, 105, and cases there cited. Defendant offered no proof to sustain this burden. As stated, the contract contemplated hedging. The fact that defendant's agent Moore departed from the contract and carried out the transactions not as hedging but as wagering on the rise and fall of the market does not affect the contract. It only enhanced the damages resulting from the breach of the contract. The loss was caused by the wrongful conduct of defendant's agent and it rather than complainant should bear the loss. Where one of two innocent persons must suffer by fraud of a third, he who enabled that person by giving him credit to commit the fraud, ought to be the sufferer. *Walker* v. *Skipwith,* 19 Tenn. 502, 508 [33 Am. Dec. 161]; 2 Mechem on Agency (2d Ed.), sec. 1984; see *Eve* v. *Union Central Life Ins. Co.,* 26 Tenn. App. 1, 167 S. W. (2d) 8; *Tennessee Products Corporation* v. *Broadway National Bank,* 25 Tenn. App. 405, 158 S. W. (2d) 361; *Conaway* v. *New York Life Ins. Co.,* 171 Tenn. 290, 102 S. W. (2d) 66; Liability of Principal for Fraud of the Agent, 7 Tennessee Law Review, 311-314.

''(6) The Acts of Congress, 15 U. S. C. A., sec. 13, relied on are aimed at discriminations and monopolies which suppress or lessen competition in interstate commerce. We find nothing in the contract before us which in anywise tended to create a monopoly or to lessen competition in interstate commerce. These Acts of Congress

did not undertake to fix the prices of commodities; but they recognize the right of dealers to make prices to meet competition. The contract here involved was of the same sort as that offered to most of the leading wholesalers in middle Tennessee and made with many of them by defendant's agent Moore. We are cited to no case which shows that such a contract violates the Acts referred to.

"Such being our conclusions upon the whole case, it results that the decree of the Chancellor is reversed and a decree will be entered here in favor of complainant a-gainst defendant for $13,807.59, together with all the costs of the cause."

As appears from this opinion, the Chancellor took the view, first, that the complainant below failed to show by a preponderance of the evidence that Moore had authority to make this agreement, which was conclusive of the litigation. However, he also stated, without discussion, that he failed to find any supporting consideration. And he also expressed the opinion that the contract was probably in violation of the Federal statutes, to which reference has been made in the opinion of the Court of Appeals.

We think it significant that the Chancellor devoted a good deal of consideration to the question of apparent authority, holding that the complainants were not en-titled to a recovery on this theory. He cited decisions of this Court and other authorities on this point. But it will have been observed that the opinion of the Court of Ap-peals finds that there was actual authority. This dis-tinction assumes importance in considering the relevancy and materiality of much testimony in the case showing that before, at and about the same time, Moore was en-tering into similar arrangements with a number of other houses in Tennessee, Georgia and Kentucky, the Court of

Appeals properly giving weight to this as material circumstantial evidence that Moore was acting with actual authority, particularly in view of the fact that the record, we think, is convincing that the officers of Lewis & Company, as well as of the associated companies Lewis & Company was representing, were on notice that he was making just this character of contract with various other concerns at this time. The Chancellor appears to have taken the view that this evidence was not relevant or material because it did not appear that complainants knew at the time they entered into their contract of these other contemporaneous transactions, but learned thereof later. This is where we are inclined to think the Chancellor fell into error.

In this Court the petitioner not only renews its contentions originally made, but invokes application of the doctrine of unclean hands, insisting that the complainants were in court with unclean hands on the theory that the basis of their claim was a wagering, speculative or gambling provision. We think that the answer made by the Court of Appeals to this insistence carries with it an answer to the attempt in this petition to invoke the doctrine of unclean hands, which is based on the charge, as above stated, that the contract was unlawful because a wagering and gambling element.

As noted by the Court of Appeals, it was represented to complainants that Lewis & Company was directly interested in large sugar reserves and that what was contemplated was what is described in the opinion of the Court of Appeals as "hedging," which is a very common practice, under such circumstances, by which sellers of commodities for future deliveries protect themselves by offsetting contracts on the exchanges. The Supreme Court of the United States has very clearly distinguished

these transactions from wagering or gambling contracts in its opinion in the case cited by the Court of Appeals of *Board of Trade, etc.,* v. *Christie Grain, etc., Co.,* 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031, approved in later cases, including *United States* v. *New York Coffee & Sugar Exchange,* 262 U. S. 611, 44 S. Ct. 225, 68 L. Ed. 475. A consideration of these opinions and of what is said by the Court of Appeals on this point has satisfied us that these complainants ought not to be denied recovery on this ground. There cannot be any doubt that a contract was entered into in good faith by Boillin-Harrison Company to buy this sugar on this absolute guaranty by Lewis & Company, through its Tennessee representative, not only clothed with apparent authority by virtue of his office as resident manager, but with actual authority to make the same character of contract with complainants that he was contemporaneously making with various others.

The writ is denied.