T. J. O'Shea et ux., Petitioners,

*v.*

First Federal Savings and Loan Association of Columbia, Respondent.

405 S.W.2d 180.

(*Nashville,* December Term, 1965.)

Opinion filed July 15, 1966.

Jerry Colley, Columbia, for petitioners.

Shelton & Shelton and T. Edward Lawwell, Columbia, for respondent.

MR. JUSTICE CRESON delivered the opinion of the Court.

Monetarily, this case is of comparatively small importance. Issuewise, however, it is of real significance. The petition for certiorari seeks review of the decision, by divided Court, of the Court of Appeals for the Middle Section of Tennessee.

This is an action for damages resulting from an alleged breach of contract. The action was originally instituted in the General Sessions Court for Maury County, Tennessee. There, the petitioners, T. J. O'Shea, et ux, were plaintiffs, and respondent, First Federal Savings and Loan Association of Columbia, was defendant. Judgment was entered in favor of respondent in the Sessions Court. The petitioners here appealed to the Maury County Circuit Court. Upon trial in the Circuit Court, a jury verdict and judgment thereon was rendered in favor of the petitioners in the amount of $695.75. The respondent

timely filed a motion for new trial. This motion was over-ruled and respondent perfected its appeal to the Court of Appeals. That Court, on October 29, 1965, rendered an opinion in which it concluded, *inter alia,* that the trial court should have directed a verdict for respondent here. Judgment was then entered reversing the judgment of the trial court and dismissing petitioners' action.

This Court reviews this case, as the Court of Appeals should have, under the well established rule,

"While these issues involve a review of the evidence, such review is not to determine where the truth lies or to find the facts, that not being our province in jury cases. It is only to determine whether there was any substantial evidence to support the verdict; and it must be governed by the rule, safeguarding the constitutional right of trial by jury, which requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict."

*D. M. Rose & Co. v. Snyder* (1947), 185 Tenn. 499, 226 S.W.2d 897.

The evidence contained in this case would justify the jury finding that the petitioners purchased a home in Columbia from one B. H. Pigg. The respondent financed said purchase, taking a note in the amount of $14,300.00, executed by petitioners. This note was secured by deed of trust on the property and improvements. After the loan was negotiated and committed, it was finally closed at the office of the respondent, in Columbia, Tennessee. As is usual in such cases, the petitioner, Mr. O'Shea, was asked

to examine the closing statement prepared by the respondent. It is pertinent to note, at this point, that Mr. Forrest Watson was the respondent's General Manager and handled all the detail of negotiation and commitment for such loan. When the time for closing loans arrived, he usually was, and was in this case, assisted by regular legal counsel of respondent.

Mr. O'Shea testified that at that time he inquired of Mr. Watson if the title insurance policy, which was uniformly mentioned in the loan documents only as "title insurance", to be obtained, would protect the petitioners against any lien claims on the house. According to Mr. O'Shea's testimony, Mr. Watson answered, unconditionally, that it would. Upon reading Mr. Watson's testimony on this phase of the case, we find it somewhat contradictory. At one place in the record Mr. Watson testified that he simply did not remember being questioned as to title insurance or giving any answer in that regard. At another point during his testimony he stated that Mr. O'Shea neither asked about the title insurance nor did he tell Mr. O'Shea that he would obtain title insurance which would protect him against lien claims.

Obviously, the jury chose to accept Mr. O'Shea's version of this transaction. We are impressed that there is nothing illogical or out of the ordinary with Mr. O'Shea's contention and testimony. There is no dispute but that petitioners were compelled to pay the sum of $660.00 to remove a mechanic's lien on their property. One of the parties who had provided work and labor on the improvements was not paid by the contractor and owner, Mr. Pigg, and filed a lien against the property in that amount. This is the basis for fixation of the petitioners' damage, together with the additional sum of

$35.75 paid by the petitioners for title insurance which the record shows, without doubt, was never, in fact, obtained.

Respondent argues here that the "title insurance" referred to in the documents was mortgagee's title insurance, and therefore of no benefit to the petitioners. Respondent also urges that even had owner's title insurance been purchased, it would not have protected the petitioners against mechanic's liens; this, for the reason that the usual form of owner's title insurance excludes coverage against mechanic's liens.

The real burden of the Court of Appeals' Opinion is the conclusion that Mr. Forrest Watson was without authority to make any agreement with petitioners which would bind the respondent to procure such a title policy as would protect petitioners against the loss sustained. The record is abundantly clear that Mr. Watson was the General Manager of respondent's business in Columbia, Tennessee. As such, he not only had the authority, but the duty, to negotiate and consummate transactions of the kind involved in the present case. It is here, it seems to us, that the pivotal issue in the case is posed. Was Mr. Watson a limited or special agent, or was he rightly to be considered a general agent? If Mr. Watson was an agent, limited or special in character, then it became incumbent upon Mr. O'Shea to determine what authority he had. If the agency of Mr. Watson is rightly to be regarded as general in character, additional rules of the law of agency come into determinative play. We feel no hesitancy whatever in reaching the conclusion that Mr. Forrest Watson, under the facts of this record, is to be legally classified as a general agent of the respondent.

624

Against this background, we now examine the law as to the legal impact on the instant case of this conclusion.

In *Continental Ins. Co. v. Schulman* (1917) 140 Tenn. 481, 205 S.W. 315, it is aptly said:

"By a general agency is understood not merely a person substituted in place of another, for transacting all manner of business, since there are few instances in common use of an agency of that description, but a person whom a man puts in his place to transact all his business of a particular kind, as to buying and selling certain kinds of wares, to negotiate certain contracts, and the like."

It is further the settled law of this State that a general agent is authorized to act within the apparent scope of his authority, though this may be different from his actual powers; that is to say, an agent may bind his principals by acts within the general scope of his apparent authority, notwithstanding the use of powers in excess of authority actually given by the principal. See *Torbett v. Jones* (1935), 19 Tenn.App. 307, 86 S.W.2d 898, and *D. M. Rose v. Dysart* (1928), 8 Tenn.App. 325. Pointedly pertinent here is the following from 1 Restatement of Agency, 2nd, Sec. 162:

"Except as to statements with relation to the agent's authority, in actions brought upon a contract or to rescind a contract, a disclosed or partially disclosed principal is responsible for unauthorized representations of the agent made incidental to it, if the contract is otherwise authorized and if true representations as to the same matter are within the authority or the apparent authority of the agent, unless the other party thereto has notice that the representations are untrue or unauthorized."

The most preeminent authority on the law of agency known to us is Mechem on Agency (2d Ed.). Through the years, we have uniformly found the summations in this work of the case law of the various states to be lucid and discriminating. At Sec. 737 of this authority appears the following:

*"General and Special Agents:*

If by express appointment, or by long acquiescence, recognition or course of dealing, one man has conferred upon another the character of one possessing the requisite authority to represent him in a general way during some more or less continuous period in the transaction of all of his business of a certain kind, or at a particular place, or to perform all acts of a certain kind or class, he must be held to have conferred upon him the attributes and powers inherent in the character so bestowed. Such an agent, the law denominates, for convenience sake, a general agent.*"*

At Sec. 739, the same author makes clear the distinction between general and special agents and their respective authority:

*"The True Distinction:*

But it is none the less true that the scope of the authority of a special agent is ordinarily much more restricted than that of a general agent. The fact that the authority is conferred not for a continuing term but in a special instance, to do a specific act naturally leads to, if it does not positively require, much more minuteness of direction and much greater restrictions and limitations. From the very nature of the case, particularly of instructions and singleness of method are to be expected, and of this persons dealing with the agent may well be required to take notice.

On the other hand, where the agent is authorized to transact all the principal's business of a certain kind, or all the acts of a certain class, the very breadth of the employment, the duration of time involved and the variety of the duties to be performed necessarily involve more or less of discretion and choice of methods, and render impracticable, if not impossible, much of particularity or precision, either as to the exact means and method to be employed, or as to the scope or extent of the authority itself. Where so little is expressed, more may well be implied. The fact of such an authority, of itself, presupposes a general confidence bestowed upon the agent, and a general committal to his discretion and judgment of all beyond the essential objects to be attained and the outlines of the course to be pursued. It may not unreasonably be presumed, where nothing is indicated to the contrary, that such an agent possesses those powers which are commensurate with his undertaking, and which are usually and properly exercised by other similar agents under like circumstances. This presumption may well be and is constantly relied upon by persons dealing with such agents, and so reasonable, proper and necessary is this reliance, that it may justly be required that if the principal would impose unusual restrictions upon the authority of such an agent, he should make them known to persons who may have occasion to deal with the agent. And herein, it is believed, lies the true distinction between these two classes of authority. One is in its nature temporary, special and naturally suggests limitations of power. Of these limitations thus suggested third persons must inform themselves, unless the principal has by his words or conduct held out the agent as one upon whose authority such limitations are

not imposed. The other is, in its nature, general, continuing and unrestricted by other limitations than those which confine the authority within the bonds of what is usual, proper and necessary under like circumstances. If there are other limitations, the principal must disclose them.

Neither of these rules denies even to the special authority. its natural and ordinary incidents, and neither dispenses with that which devolves upon every person the duty of ascertaining not only the fact of the agency but also the nature and extent of the authority which the principal has apparently conferred. And either of them permits that authority to be defeated by secret limitations.''

As intimated before, we see nothing at all illogical or strange about Mr. O'Shea's testimony with respect to ''title insurance''. He did not know the distinctions made in the title insurance business; nor was he informed of them. Respondent does not deny this; it simply says, at best, no such representations were made or agreements reached.

This brings us to the question as to whether or not, if the petitioners' testimony be accepted as true, does it show a lawful predicate for liability of the respondent for failure to obtain the title insurance: In our opinion, liability is thus lawfully created. In 4 Appleman, Insurance, 113 (Sec. 2261), it is said:

''It has been stated that one who agrees to obtain insurance but who neglects his obligations in this respect, becomes himself an insurer of the property.''

There is no doubt in the record but that owner's title insurance broad enough to protect against mechanic's

liens was obtainable. The jury appears to have found that the respondent's general agent, acting within the apparent scope of his authority, agreed to procure such insurance; and that respondent failed to do so, resulting in a loss to the petitioners.

Feeling as we do, that there is material error in the majority opinion of the Court of Appeals, that judgment is reversed and that of the trial court affirmed.

BURNETT, CHIEF JUSTICE, and WHITE, DYER and CHATTIN, JUSTICES, concur.