FILED

August 17, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

**IN THE COURT OF APPEALS OF TENNESSEE**

**AT KNOXVILLE**

JERRY W. RAGON and JERRY ) C/A NO. 03A01-9711-CH-00499
LEBRON RAGON, a Partnership )
d/b/a ACTION LINEN SERVICE, ) HAMILTON CHANCERY
)
      Plaintiffs-Appellees, ) HON. R. VANN OWENS,
) CHANCELLOR
v. )
) AFFIRMED IN PART,
O'CHARLEY'S, INC., ) REVERSED IN PART,
) AND REMANDED FOR A NEW TRIAL
      Defendant-Appellant. ) ON THE ISSUE OF DAMAGES

ROBERT D. BRADSHAW and B. STEWART JENKINS, JENKINS &
BRADSHAW, P.C., Chattanooga, for Plaintiffs-Appellees.

JOHN G. JACKSON, CHAMBLISS, BAHNER & STOPHEL, Chattanooga, for
Defendant-Appellant.

**O P I N I O N**

Franks, J.

In this breach of contract action for damages, the jury returned special

verdicts in plaintiffs' favor, and the Chancellor entered a judgment for damages

against defendant. Defendant has appealed. The issues on appeal raised by

defendants are:

    I.     Whether the Chancellor erred in not sustaining O'Charley's
           objection to defective verdict, or in the alternative in not granting
           a new trial, as the jury's verdict was inconsistent and contrary to
           the manifest weight of the evidence?

II.  Whether in the alternative, the Chancellor erred in refusing to suggest a remittitur, as the jury's award of damages was excessive and contrary to the manifest weight of the evidence?

III. Whether the Chancellor erred in failing to grant O'Charley's motion in limine, and/or for directed verdict on the alleged Hixson contract. As the proof clearly showed, the plaintiff destroyed and rescinded a copy of the alleged contract with the intent to release O'Charley's from any obligation it may have had under the alleged contract?

The focal point of this dispute is a contract for linen service entered between plaintiffs and defendant's kitchen manager, Jason Giacchi, at the Hixson restaurant. Plaintiff had begun providing linen service to defendant's Dalton restaurant in 1993. The original contract with the Dalton restaurant was an oral agreement[1] with the kitchen manager to supply linens.

Plaintiff Jerry Ragon testified that he first contacted the general manager of the "Shallowford Drive" restaurant in Chattanooga, Jerry Madden, about providing linen service to O'Charley's restaurants. Madden advised that he was under a contract with another service, but informed of the opening of the Dalton restaurant. Madden referred Ragon to Alan Goins who would be the manager of the Dalton restaurant, and plaintiffs entered into an oral agreement to provide linen service for the Dalton outlet. Subsequently, Madden advised that defendant had purchased the Black Eyed Pea restaurant in Hixson and was converting it to an O'Charley's. Madden told plaintiff to contact Wes Wilkerson, who would be the general manager of the Hixson restaurant, about supplying linen services. Plaintiff went to the Hixson restaurant where construction was underway, and approached Wilkerson about providing linen service. Wilkerson told him to talk to Jason Giacchi who was the kitchen manager and handled the linen for the restaurant. Plaintiff spoke with Giacchi and discussed the type of

_____

[1]

Plaintiffs subsequently entered into a written contract executed by the manager with the Dalton restaurant.

2

service needed, and they negotiated a contract for linen service. Plaintiff explained that he wanted a written contract because the Hixson restaurant needed uniforms supplied, which plaintiffs would have to purchase, as well as the increased volume would require additional equipment to service that volume.

A boiler plate contract was furnished Giacchi who filled it out with the aid of plaintiff, and Giacchi signed as kitchen manager and Ragon also signed. Giacchi retained the original and Ragon the copy. Subsequently, plaintiff was called by Alan Goins at the Shallowford restaurant, who advised that his linen contract was up with the other company, and plaintiff entered into an oral agreement to provide linen service for the Shallowford restaurant. He explained that a written contract was not needed, since he was only supplying linens, and that plaintiff had an adequate inventory to service this restaurant.

Plaintiff testified that on January 8, 1996, plaintiffs went to the Hixson store on a regular service call and was advised by the manager that he had a new linen company, and that "I needed to gather my stuff and get out of the store". He denied that he had received any complaints about the quality of his service prior to the abrupt termination.

In the special interrogatories submitted to the jury, the jury was asked if Giacchi had "actual authority" to execute the contract, to which the jury responded in the negative. The jury was also queried as to whether Giacchi had "apparent authority" to execute the contract. The jury responded affirmatively, and the Trial Judge approved this verdict.

Defendant contends under the first issue that these findings are inconsistent, and argues that there was no evidence that defendant had ever allowed a kitchen manager to sign such contracts, there was no evidence that kitchen managers had theretofore signed such contracts, and no proof was offered that plaintiff had ever

3

been told that kitchen managers could sign such contracts. These findings are not inconsistent, but contrast the distinction between actual and apparent authority. Our Supreme Court gave this explanation in *O'Shea v. First Fed. Savings, etc.,* 218 Tenn. 619-624 (1966), and said:

> It is further the settled law of this State that a general agent is authorized to act within the apparent scope of his authority, though this may be different from his actual powers; that is to say, an agent may bind his principals by acts within the general scope of his apparent authority, notwithstanding the use of powers in excess of authority actually given by the principal.

Accordingly, the lack of evidence of actual authority does not necessarily defeat a finding of apparent authority.

The issue thus becomes whether there is material evidence to support the jury's verdict. We are only authorized to set aside a jury verdict if there is no material evidence to support it. T.R.A.P. Rule 13(d).

In addition to the foregoing, plaintiffs offered the testimony of Darryl MacConkey, who had served as the first assistant manager at the Hixson restaurant. He testified that he had never heard of plaintiff when he went to work at the Hixson store, but was told by Giacchi that plaintiff was providing the linen service. He further testified:

Q. Did you at some point in time see written proof that Action Linen Service would be the provider of the linen service there?

A. Yes, I did.

Q. What did you see?

A. I saw a contract from Action Linen.

Q. Did you have occasion to look at the contract and see who had signed it?

A. I glanced at it, but I was in the process of filing a lot of warranties and stuff, trying to get the office put together.

Q. Now explain that to us. How did you come about filing

4

warranties, etc.?

A.    Wes Wilkerson was the general manager and he had Shelly Perry and myself filing all the warranties on the equipment in the kitchen that fall in my domain as being a first assistant, so we were filing them away.

Q.    And you had occasion to file the document that you've .

A.    Yes.

Q.    You've . . . referred to.

A.    Yes.

A good statement of what the plaintiff is required to show to establish the apparent authority of the agent is set forth in 3 Am.Jur.2d Agency §80, p.587:

> In order to establish that an agent had the apparent authority to do the act in question, it must be established (1) that the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority, (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority, and (3) that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

*Accord*: *Rich Printing Co. v. McKellar's Estate*, 46 Tenn. 444, 478-9 (1959). We conclude there is material evidence to support this verdict. The trier of fact could reasonably infer that the manager[2] had knowingly permitted the agent to enter into the contract from the foregoing evidence. Evidence that an agent who acts with the knowledge and approval of his principal is circumstantial evidence of what the agent was authorized to do. *Boillin-Harrison Co. V. Lewis & Co.*, 182 Tenn. 342, 187 S.W.2d 17. *Rich Printing Co.*

We find the first issue to be without merit.

The jury's verdict approved by the Trial Judge was for $52,960.00 as

---

[2] There is material evidence that a manager had "actual" authority to enter such contracts.

liquidated damages for breach of the Hixson restaurant contract, and unliquidated damages of $33,000.00 for the breach of the Dalton restaurant contract.

Defendant's second issue questions the propriety of the damages awarded, on two bases. It asserts that the $33,000.00 award of actual damages for the breach of the Dalton contract "is contrary to the manifest weight of the evidence" and that there is no evidence to support the jury's finding of liquidated damages for the breach of the Hixson contract.

We again observe that our review is not to weigh the evidence, but to determine if there is material evidence to support the jury's finding. T.R.A.P. Rule 13(d). Under the evidence, the liquidated damage clause in the Dalton contract set damages at $44,798.20. The jury, in answer to questions, concluded as to this contract amounted to an unenforceable penalty, and found actual damages to be $33,000.00. However, as to the Hixson contract, the jury found that the damages calculated by the liquidated damage clause was reasonable and not a penalty. It then found that the liquidated damage clause was enforceable, and set the liquidated damages as heretofore noted. The provision for liquidated damages in the Hixson and Dalton contracts state:

> The parties agree that in the event of any termination of service by the customer in breach of this contract, the supplier shall be entitled to liquidated damages in the amount equal to forty (40%) percent of the average weekly fees charged for services hereunder prior to the date of termination, multiplied by the number of weeks remaining in the unexpired term of this contract. Said liquidation is not a penalty, but is intended to compensate the supplier for expenses which would have been absorbed and profit which would have been generated by the customer's fulfillment of its obligation under this contract.

Defendant contends that the liquidated damages awarded by the jury under the Hixson contract is "grossly in excess of actual damages". The Supreme Court in *V.L. Nicholson Co. v. Transcon Inv.*, 595 S.W.2d 474, 484 (Tenn. 1980), explained why and when liquidated damages are appropriate:

6

The term "liquidated damages" means a sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injuries, should a breach occur. 22 Am.Jur Damages 212, 1965. *See Railroad v. Cabinet Co.*, 104 Tenn. 568, 58 Southwestern 303 (1900). The reason for allowing parties to stipulate the amount of damages is to create certainty where damages are likely to be uncertain and not easily proven. *Railroad v. Cabinet Co., supra.* The amount stipulated should be reasonable in relation to the terms of the contract and the certainty with which damages can be measured; there must exist a reasonable relationship between the amount and what might reasonably be expected in the event of a breach. *Id.* If the provision is a reasonable estimate of the damages that would occur from a breach, then the provision is normally construed as an enforceable stipulation for liquidated damages.

The evidence establishes that damages for breach of contracts of this nature are not easily established. Plaintiff testified to inventory investment in excess of $10,000.00, and included 40% of the cost for equipment, van, overhead, including insurance, license, rent and anticipated profits as elements of damages. He was of the opinion that his losses for breach of the contract exceeded the stipulated liquidated damages. In his analysis, he did the same cost scenario for the Dalton contract, and offered an opinion that his losses for that breach were slightly in excess of $40,000.00.

While plaintiff was permitted to offer his opinion of damages without objection, there is no material evidence to support a finding that plaintiff's actual damages bore a reasonable relationship to the stipulated damages in the contracts. The evidence does not establish that plaintiff's opinion of his losses is based on accurate analysis derived from sound cost accounting principles. Accordingly, we set aside the jury verdict on the amount of damages, and award a new trial on the issue of actual damages for breach of these contracts.

Prior to trial, defendant had withdrawn its defense of the unreasonableness of the liquidated damage clauses, but took the position at trial that it intended to argue that liquidated damages were not the proper measure of damages under the contracts. The Trial Judge agreed to this procedure after the parties agreed

7

that the plaintiff could, after the defendant's proof, offer evidence of his damages. It is clear the plaintiff suffered damages, but it is also clear that he was not prepared to offer evidence on the issue of actual damages. Because of the procedural tactics[3] of defendant and our dissatisfaction with the sufficiency of the evidence on the issue of actual damages, we remand for a new trial on the issue of actual damages, for the breach of both contracts. On remand, plaintiff will be entitled to offer proof of damages in the nature of reasonable expenses made in preparation for performing these contracts. *See* 22 Am.Jur.2d *Damages* §596, and profits lost as a result of the breach of the contract. Plaintiff will be required to establish his lost profits to a reasonable degree of certainty, but since prospective profits are to some extent uncertain and problematical, uncertainty as to the amount of profits that would have been realized, will not prevent a recovery. 22 Am.Jur.2d *Damages* §625, p. 686.

Finally, defendant argues that it should have been granted a directed verdict on the Hixson contract because the proof established that plaintiff had destroyed and rescinded the contract with the intent of releasing defendant from any obligations under the contract. We do not agree. Plaintiff testified that he advised defendant's agents that he would "tear up" the Hixson contract if defendant would honor the other two contracts with their outlets. He further testified that the agent had indicated that plaintiff would lose the other business if he attempted to enforce the Hixson contract. However, after that conversation, plaintiff also lost the other contracts within a short time. Under these circumstances, there was material evidence to support the jury's finding that there was no meeting of the minds on a "cancellation" of the Hixson contract.

We affirm the judgment of the Trial Court in part and reverse in part,

---

[3] After withdrawing the affirmative defense, defendant essentially raised it again during trial.

8

and remand for a new trial on the issue of damages for breach of the contracts.

The cost of the appeal is assessed one-half to plaintiffs and one-half to defendant.

_____
_____
Herschel P. Franks, J.

CONCUR:


_____
Charles D. Susano, Jr., J.




_____
William H. Inman, Sr.J.