# ARKANSAS DAILIES, Inc. v. DAN et al.—260 S. W. (2d) 200.

Western Division at Jackson. February 18, 1953.

Petition for Certiorari denied by Supreme Court, July 17, 1953.

664

W. F. Murrah, of Memphis, Elihu E. Berwald, of Dallas, Tex., Jack M. Ginsberg, of New York City, for appellant.

Canada, Russell & Turner, of Memphis, for appellee.

SWEPSTON, J. This is a suit by a former employer to enjoin a former employee from violating a restrictive covenant in the contract of employment.

The suit was heard by the Chancellor upon a written stipulation filed in the cause for hearing on oral testimony

The Chancellor found (1) the business of complainant is that of a service organization and does not involve trade secrets, (2) that the written contract of April 23, 1946 with defendant was cancelled in December 1946 by oral agreement of the parties and has not been in effect since then, (3) that, if not cancelled, said contract, although reasonable as to space, being necessarily limited according to the intention of the parties to the states in which its business was carried on insofar as defendant was concerned, was wholly unreasonable as to time of three years following termination of defendant's employment, this being all the more true in view of the fact that the contract was for 30-day periods only and terminable on 30 days' notice, and was therefore void on its face, and (4) that a violation of the contract would not be enjoined, but it appearing defendant in violation of Code Section 7811 had induced the breach, or attempted to induce the breach, of some of complainant's existing contracts with its customers, this conduct would be enjoined.

Defendant has taken no appeal from this injunction as to existing contracts and the question is not now material.

Complainant has appealed and assigned three errors: (1) in holding the contract to have been rescinded; (2) in holding said contract unreasonable as to the three-year restriction; and (3) in holding there were no trade secrets involved in the complainant's business.

The following facts are without dispute.

Complainant's business consists of securing national advertising which it sells to newspapers in the smaller cities in the South and Southwest under contracts running from one to five years and for its compensation it receives a percentage of the amounts paid to the newspapers by the national advertisers. It maintains offices throughout the United States in the larger cities, but the Memphis office and the four States handled from it are involved in this suit; the States are Tennessee, Kentucky, Louisiana and Mississippi.

This is a highly competitive business. There are ninety daily newspapers in this four-state area, of which complainant has contracts with twenty-six, and eight or nine competitive businesses exist in this area.

Defendant Dan went to work for complainant in 1944 as manager of the Memphis office and remained as such until April 30, 1952, when he resigned voluntarily and began soliciting only the clients of complainant for another company and succeeded in procuring the breach of several of complainant's contracts before the temporary injunction was issued herein.

Defendant's salary at first was $250 per month, then $350 when on April 23, 1946, it was increased to $400 plus certain commissions and the following written contract was entered into with the complainant:

"Mr. Charles Dan

"Arkansas Dailies, Inc.

"1603 Sterick Building

"Memphis 3, Tennessee

"Dear Mr. Dan

"This letter will serve when accepted by you below as your contract of employment by Arkansas Dailies, Inc. commencing March 1, 1946.

"Your duties shall consist of servicing newspapers now on your list in the sale of National Advertising and, likewise, the securing of new publications as additions to our present list, such work to be performed in territories defined in advance.

"For your compensation you shall receive, effective March 1, 1946, $400.00 per month.

"In addition to the above, a special commission of 6% will be paid you on new papers secured by you in the states of Kansas and Kentucky, it being the understanding that these commissions will commence on papers now represented by us in Kansas retroactive to March 1, 1946. On all other publications secured by you in the territory in which we operate, you will receive the following commissions:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6% | on | publications | whose | annual | net | revenue | to | us | is | $1500 | to | $4000 |
| 10% | " | " | " | " | " | " | " | " | " | 4000 | " | 6000 |
| 12% | " | " | " | " | " | " | " | " | " | 6000 | " | 10,000 |
| 15% | " | " | " | " | " | " | " | " | " | 10,000 | " | 15,000 |
| 20% | " | " | " | " | " | " | " | " | " | | over | 15,000 |

The above commissions will be payable to you on the annual net income to use after the payment due our northern and eastern representatives. The above commission arrangement shall commence with the effective date of the publication's contract and will be payable quarterly for a period of two years.

"In the event that you cease to be an employee of our organization, all salaries and commissions shall cease forthwith.

"It is further agreed that should you leave the employ of Arkansas Dailies, Inc., you will not for a period of three years from that date solicit the representation of any newspaper, radio station, or research client that we represent or have represented during your connection with us.

"This contract shall be in effect for thirty days from March 1, 1946, and thereafter for thirty day periods until either party shall give the other party thirty days notice in writing of intention to cancel.

"Your signature below will make this a binding agreement between us.

"Yours very truly,
"Arkansas Dailies, Inc.
"By /s/W. E. Hussman
"President

"WEHussman/m

"Accepted:

"Charles Dan"

Up to this time Dan had made contracts with 10 additional newspapers for the benefit of complainant.

After this time these commissions on new contracts secured by him amounted to only $8.83 per month.

In December 1946 stock control of complainant corporation had been acquired by a Texas corporation headed by S. W. Papert, Sr., who shortly thereafter called Dan and two other key employees to Dallas for a policy conference, as a partial result of which an increase in salary of $50 per month was given Dan and some increase given to the other two, Howard and Bryson.

It is the conversation which Dan testified occurred at this time between him and Papert, Sr., after the other two men has left them alone in the conference, that he says he thought was a rescission of the contract. Papert, Sr. died in April 1951, before the trial, and hence we do not have his testimony, Dan testified:

"And I talked to Mr. Papert as the the the fact that I find this commission arrangement in the contract, and he told me at the time, he said: 'You can do whatever you like; if you care to, you can take the raise I'm offering you, and you can disregard the terms of the contract', and I said, 'that will be satisfactory' ".

Subsequently no commissions were paid under the above quoted contract. Dan further testified that, when Papert Sr. offered him the $50 increase and gave him the choice between it and the terms of the contract and he chose the increase, this was the entire conversation; that he did not ask Papert to destroy the contract; that thereafter he never mentioned the contract to Papert Sr. nor to anybody else nor was it mentioned to him; that in the early part of 1948 Papert, Sr. inquired why Dan had not signed up any new newspapers since 1946, to which he replied: "I told him at the time of our discussion that there was a heavy responsibility in servicing of the papers, and that I had to do it, and that I did not see any point in doing it and not making any money". This resulted in Dan receiving an increase of $75 a month.

He testified that during the nine years he was employed by defendant he signed up 20 new accounts, so that if he signed 10 before the 1946 contract and none afterwards until he received this $75 increase in 1948, obviously he signed 10 after early 1948 until he resigned in 1952.

When he resigned he was being paid $10,000 a year by complainant and his resignation was voluntary. The un-

disputed evidence is that the company he went to work for as president and general manager was organized by James E. Charlet, a newspaper publisher at Clarksville, Tennessee, and Dan was employed with the agreement that he would be allowed later to purchase stock in the company.

It appears that complainant desired the restrictive clause by reason of its experience with the former manager, Wallace Witmer, whom Dan succeeded. Complainant had no such contract with Witmer and when Witmer quit the company he began competing with complainant and soliciting its customers whose contracts had expired.

In that case, cited below, complainant was unsuccessful for reasons stated in the opinion in its attempt to enjoin Witmer.

It further appears that complainant has expended about $30,000 on expense account furnished Dan during the time of his employment to pay expenses of his travel and entertainment of customers and prospective customers in calling upon them and in attending conventions.

The Chancellor in concluding that the entire contract of 1946 was rescinded or abandoned expressed his reluctance to predicate such a finding on the testimony of one party to a conversation when the other party was dead and hence not available, but he felt that Dan was corroborated by the fact that he secured no new accounts during the period from April 1946, when the commission arrangement was abandoned, but did secure new ones after early 1948 when the increase of $75 was given him.

With all deference to the able Chancellor we are not able to see how these events and conduct tend to show any more than a modification of the written contract as to the compensation to be paid Dan and an inference that there was an implied modification of his duty with respect

to solicitation of new accounts. We assume Dan told the truth.

Dan testified that there was no mention in the conversation of the restrictive clause in the existing contract, that the subject always discussed was pay increases, and he never requested the destruction of the written contract.

It fully appears that there was no change in the conditions which brought about the desire on the part of complainant for the restrictive clause; Dan was a valuable employee, he was the one through whom the personal contacts of complainant were made with the newspapers, and the longer he remained with complainant and the more accounts he obtained, the wider his personal acquaintance and probable influence became among the customers and hence the better his position to strike out on his own.

There is no inconsistency between the modifications shown by the words and conduct of the parties and the continued existence of the restrictive clause.

■ "However, mutual abandonment, cancellation, or rescission must be clearly expressed, and acts and conduct of the parties to be sufficient, must be positive, unequivocal, and inconsistent with the existence of the contract. Conduct which is not necessarily inconsistent with continuance of the contract will not be regarded as showing an implied agreement to discharge the contract, although it may be consistent with such an agreement''. 17 C. J. S., Contracts, Sec. 389, p. 882.

■ Therefore, since the restrictive clause was not the subject of discussion by the parties, and neither the modifications shown by the evidence, nor the conduct of the parties nor the surrounding circumstances are inconsistent with the continued existence of the restrictive clause, we hold there was no rescission or abandonment but only a modification pro tanto of the 1946 contract,

because there was no meeting of minds. It is fundamental that either in the making of a contract or in the rescission or abandonment of same, the intention to do so must be mutual and the unexpressed intention of one of the parties not known to the other either expressly or by reasonable implication forms no part of the mutual act.

The first assignment is sustained.

We consider the third assignment next in order, which poses the question of fact whether defendant acquired any trade secrets.

In the discussion of both the second and third assignments we shall refer to an unusual opinion of the Common Pleas Court of Cuyahoga, Ohio styled Arthur Murray Dance Studios of Cleveland v. Witter, 105 N. E. (2d) 685, in which appears an exhaustive treatise on the subject of restrictive clauses. On page 709 is a discussion with citation of authority as to what is a trade secret necessary to obtain equitable relief. It is there said that ''it must be known only to the particular employer and those of his employees to whom it is necessary to confide it in order to use it for what it is intended. It is something known only to one or a few and kept from others. The question is not whether it is not known to the general public. It must be a secret of the particular employer and not a general secret of the trade''. Also, ''There is no presumption that a thing is a secret. The burden is on [the employer] to prove that it is a secret''.

In complainant's brief it is said that in a service business the only trade secrets are as in the instant case. That Dan (1) knew the expiration dates of each of the complainant's contracts (2) the percentage of compensation to complainant under each of these contracts, and (3) the individual problems of each customer and the personal habits of mind which influenced the decision of the

newspaper publisher. That armed with this knowledge he is able to approach a customer of complainant on terms of intimacy and familiarity at the right time with the right price.

In response Dan testified that all of this information may be obtained by any competitor from the customers themselves in the ordinary course of dickering for the lowest price and most favorable contract.

That may or may not be true depending on the tactics of the particular customer, but, if true, it is by no means a satisfactory answer, because any customer list may be discovered by following a salesman on his route; also, it is particular knowledge acquired by Dan by virtue of his employment rather than general knowledge and experience of the trade; and it is necessarily tied in with the question of good will of the business, because Dan during his employment was "Mr. Good Will" himself to the customers, because he alone had all the dealings with them for his employer.

"A business is built upon the confidence of its customers and the employee gains acquaintances and sells the customers by using the good will of the employer. The employer's dealings with his customers through the employee gives the employee confidential knowledge that should not be divulged or used for his own benefit. It is by reason of this personal, if not confidential, relationship which the parties sustain that contracts to protect the employer by restriction of subsequent employment within reasonable limits of time and of space are permitted and sanctioned, and equity will enjoin the employee from competing in violation of his covenant." Briggs v. Butler, 140 Ohio St. 499, 45 N. E. (2d) 757, 762. This is in accord with the case of Matthews v. Barnes, 155 Tenn. 110, 293 S. W. 993, 52 A. L. R. 1350, and cases referred to therein

and the Court declined to make a distinction between professional and non-professional employment.

There were probably more trade secrets in that case than are to be found here but surely not any more in the Portrait Company case (Chicago Portrait Co. v. C. A. Talley, Davidson Equity) cited and approved in the opinion and the personal contact was not an element in the Portrait case.

The importance of the personal contact element is reflected also in the cases cited on page 696 of the Arthur Murray case.

■ Therefore, while the Chancellor was correct within the strict definition, supra, of trade secrets in holding that there were none and we therefore do not sustain this assignment of error, we think he failed to recognize the importance of the particular information gained by Dan and the effect of the personal contact he and he alone had with the customers. It strains credulity to treat these as unimportant elements of the case; they are the things about which the parties contracted and Dan made use of them so soon as he quit the plaintiff.

Referring to the second assignment, the Chancellor held that the three-year period was too long, although he felt that one year would be undoubtedly reasonable and perhaps two years, but that three was rather long; especially in view of the contract being terminable on 30 days' notice, he held it to void on its face.

As to the latter statement, we have no doubt that, if the record showed any oppression by the employer by having secured this contract and then shortly thereafter discharged the employee, the employer would have no standing in a court of equity. But such is not the fact; the employment continued for six years and then the

employee voluntarily quit after repeated increases in salary.

■ It is true, as urged by counsel for Dan, that the rights of the parties are fixed by the contract and that complainant could have discharged Dan after the first 30 days. The question before us is not, however, the unquestioned right of either party to end the employment, but is whether complainant is entitled to enforce the restrictive clause now that Dan has quit the employment. Obviously complainant is guilty of no inequitable conduct in this respect. See Granger v. Craven, 159 Minn. 296, 199 N. W. 10, 52 A. L. R. 1356.

We do not think the contract is void on its face; in fact such contracts are of frequent occurrence and have not been held void on their faces but have been enforced or not by injunction, depending upon what the conduct of the employer has been as shown by the evidence and other pertinent facts. See the cases cited on page 700 of the Arthur Murray case, supra, on the subject of harshness or oppression.

It is insisted also that the contract is unreasonable and oppressive because it covers former customers who may not have been such for eight or nine years and therefore complainant could have no interest to protect. Considered alone and in the abstract this contention is plausible; this could not have been said of it when the contract was young and the thought has acquired plausibility by the lapse of time, but there is nothing in evidence to show the existence of such former customers as a present fact relevant to present equities.

It is further insisted that the contract is oppressive because Dan is a family man who has to work for a living and this is the only line of work for which he is fitted; it

may be remarked that he has lots of company in this respect.

In answer to these arguments of oppressiveness, however, it is well to note that this restrictive clause is very limited; it does not debar Dan from following his line of work at all; it leaves the whole field to his endeavors except present and former customers while he was employed by complainant. In the majority of cases the courts are dealing with all-inclusive restrictions.

Now, as to the period of three years what has just been said seems very pertinent; also the complainant's evidence is undisputed that its contracts run from 1 to 5 years, most of them having an automatic renewal clause unless notice to the contrary be given; the average of all contracts is 2½ years.

Under the undisputed evidence mentioned in the paragraph next above, in view of the circumstances of the case as we have already attempted to develop them and in the light of our Supreme Court decisions where longer periods of time have been approved in cases of prohibition against all competition by a former employee, we think three years must be held to be reasonable.

We therefore sustain the second assignment.

A decree will be entered here accordingly enjoining defendant, Dan, personally and as president and general manager of Newspapers South, Inc. from soliciting the representation of any clients complainant has represented during his employment by complainant and to that extent the decree below is reversed and the cause remanded for the enforcement of same and for further proceedings on the reference ordered by the Chancellor.

The record does not justify this injunction against the other defendant, Newspapers South, Inc., the same being the corporation by whom Dan is employed.

The costs of appeal will be paid by defendant Dan.

Anderson, P. J., and Baptist, J., concur.