Elaine McREYNOLDS, Commissioner of Commerce and Insurance for the State of Tennessee as Receiver for Cherokee Insurance Company, Petitioner,

v.

CHEROKEE INSURANCE COMPANY, Respondent.

David S. WEED, Special Deputy Commissioner of Insurance for the Rehabilitation of Cherokee Insurance Company, Plaintiff/Appellant,

v.

DIAMOND FINANCIAL HOLDINGS, INC., Defendant/Appellee.

Court of Appeals of Tennessee, Middle Section.

Aug. 17, 1994.

Rehearings Denied Oct. 13, 1994 and Dec. 21, 1994.

Permission to appeal Denied by Supreme Court April 3, 1995.

Michael L. Dagley, Michael Hinchion, and Garry K. Grooms, Nashville, for plaintiff/appellant.

Val Sanford, Nashville, and John Deq. Briggs, III and Michael J. Hurley, Washington, DC, for defendant/appellee.

## OPINION

CANTRELL, Judge.

This is an action by the Special Deputy Commissioner of Insurance for the Rehabilitation of Cherokee Insurance Company, against Cherokee's owner, Diamond Financial Holdings, Inc., for the amounts allegedly due under a tax sharing agreement. The Chancery Court of Davidson County granted summary judgment to Diamond, holding that the agreement was terminated at the end of June 1984 and that the rehabilitator could not revise Cherokee's annual statements for the years 1982, 1983, and 1984. We affirm.

### I.

Diamond, a wholly-owned subsidiary of Dana Corporation, acquired all of Cherokee's capital stock in November of 1980. In February of 1982 Diamond and Cherokee entered into the tax sharing agreement that is the heart of this controversy. The pertinent parts of the agreement are:

1. To the extent permitted by applicable federal income tax laws, Diamond and its subsidiaries will file a consolidated federal income tax return and include Cherokee therein.

2. Diamond shall reimburse Cherokee any amount equal to 100 percent of Cherokee's current federal tax benefit, as computed under generally accepted accounting principles and reported in Cherokee's financial statements provided that such provision represents a credit or negative income tax expense.

3. In the event that Cherokee's current federal tax provision, as computed under generally accepted accounting principles and reported in Cherokee's financial statements, represents a debit or positive income tax expense, then Cherokee shall reimburse Diamond an amount equal to 100 percent of such provision.

4. To the extent that reimbursement is required by either party under paragraphs 2 or 3 above, such reimburse-

ment shall be made on quarterly basis within 30 days following the end of each calendar quarter. The reimbursement shall be based on the financial statement current federal tax provisions for the quarter, as computed under generally accepted accounting principles and reported in the Cherokee's quarterly financial statements.

The agreement did not include a statement of duration and did not incorporate any stipulations regarding termination.

From February 1982 through March 31, 1984, Diamond paid Cherokee all obligations arising under the agreement. The amounts were calculated based on Cherokee's current federal tax position as reported on its quarterly financial statements.

Cherokee was, during 1983 and the early part of 1984, going through a financial crisis. By June of 1984 the senior officers of Cherokee, Diamond, and Dana were aware that Cherokee was incurring staggering losses due, in part, to the troubles experienced by its two principal reinsurers. Consequently, on June 28, 1984, Diamond terminated the tax agreement in a letter hand delivered to Cherokee the next day.

On July 17, 1984 Cherokee was placed in voluntary rehabilitation in the Chancery Court of Davidson County. The chancellor appointed the insurance commissioner as receiver and the commissioner appointed the plaintiff as rehabilitator.

On March 1, 1990, the rehabilitator filed a complaint against Diamond seeking a declaratory judgment that Diamond did not legally terminate the tax sharing agreement in June of 1984 and that Diamond owed Cherokee substantial amounts under the agreement for the years 1983 and 1984. On the same day he filed this action, the plaintiff selectively revised Cherokee's financial statements to show greater losses than the statements originally indicated.

The restated financial statements contain two major revisions showing Cherokee suffered much higher losses than originally reported. The first involves the recharacterization of a $6,500,000 payment made by Diamond to Cherokee in 1983. Shown on the original statement as premium income, the plaintiff insists that the payment was in fact a capital contribution. Thus, Cherokee's losses were $6,500,000 greater than earlier indicated, resulting in a $2,990,000 obligation from Diamond under the tax sharing agreement. (Cherokee's marginal tax rate was forty-six percent.).

The other revision to the 1984 financial statement involved taking losses in 1984 that were originally reported in 1985. In its original 1984 statement Cherokee reported $16,008,391 due from two reinsurers. The plaintiff's position is that the asset was, in fact, worthless in 1984 and should have been written off then. The effect on Cherokee's tax position for 1984 would be $7,313,860.

## II.

The plaintiff's contention boils down to this: that the tax sharing agreement was in effect until at least December 31, 1984, and that the revised financial statements show an obligation from Diamond to Cherokee based on the agreement. (The chancellor held that the agreement was in effect through the second quarter of 1984 and the parties have settled the claim for the amount owed up to that date.).

█ The first question is whether Diamond had the right to terminate the agreement. Diamond argues that since the contract did not contain a termination date it was terminable at will. Although Diamond also argues that the contract is governed by Tennessee law, it does not cite any authority for the terminable at will theory. Perhaps the proposition is so well known that it should be judicially noticed, but the authorities with which we are familiar say that contracts for an indefinite duration are generally terminable at will by either party *with reasonable notice*. *First Flight Associates, Inc. v. Professional Golf Co., Inc.*, 527 F.2d 931 (6th Cir.1975); *Misco, Inc. v. United States Steel*, 784 F.2d 198 (6th Cir.1986); *see also* 17A C.J.S. Contracts § 398. We do not think that the question of reasonable notice could be reached on this record on a motion for summary judgment.

The intention of the parties is, of course, the ultimate question to be decided on the construction of any agreement. *McCall v. Oldenburg*, 53 Tenn.App. 300, 382 S.W.2d 537 (1964). It may be, as Diamond also argues, that the parties intended the contract to be terminable at will *without notice*, but we think the record would not allow that conclusion to be made on a motion for summary judgment either.

But, assuming that Diamond did not have the right to terminate the agreement without reasonable notice, did Diamond in fact terminate the agreement by its letter of June 28, 1984? Even a continuing contract may be terminated by one party *if the other party assents*. *Tidwell v. Morgan Bldg. Systems, Inc.*, 840 S.W.2d 373 (Tenn. App.1992). What the cases call a mutual rescission may be effected by acts and conduct that are positive, unequivocal, and inconsistent with the contract's existence. *Id.; Arkansas Dailies, Inc. v. Dan*, 36 Tenn.App. 663, 260 S.W.2d 200 (1953).

We think the uncontradicted proof in the record shows that Cherokee assented to the rescission. After the delivery of the letter of June 28, 1984, Cherokee's treasurer reported to the company president that Cherokee took the position that the agreement was valid through June 28, 1984. Cherokee's president (who was president when the agreement was entered into) did not object to the termination. Neither he nor anyone else at Cherokee ever advised Diamond that they believed the tax agreement continued in effect beyond June 1984. In March of 1985, when the company was already in rehabilitation, the company tax returns filed with the Tennessee Department of Insurance state that "through June, 1984, there was a written agreement in effect between the companies as to the method of allocation" of Cherokee's federal income tax. The only claim reflected on the balance sheet was for the amounts due through the second quarter of 1984. For five more years the parties acted as if the contract had been terminated in 1984. The acts and conduct of Cherokee and the rehabilitator are positive, unequivocal, and inconsistent with the existence of the contract.

## III.

The plaintiff argues that the tax sharing agreement was governed by the federal income tax laws and that federal law required the parties to file a consolidated return for 1984. The argument is, in effect, that federal law prohibited Diamond from terminating the agreement until the end of 1984.

The chancellor held that the agreement did not incorporate the federal income tax laws. We concur. The only provision in the agreement referring to federal laws is found in paragraph I: "To the extent permitted by applicable federal income tax laws, Diamond and its subsidiaries will file a consolidated federal income tax return and include Cherokee therein." This provision does not incorporate federal income tax laws; it merely states that to the extent permitted by such laws, Diamond and its subsidiaries would file a consolidated tax return.

In fact, when Diamond acquired Cherokee in 1980, before the execution of the tax sharing agreement, Cherokee became an "includible corporation" in the affiliated group of corporations owned by Diamond's owner, Dana. Because Dana had elected with the Internal Revenue Service in 1972 to file a consolidated income tax return with its subsidiaries and affiliates, Cherokee became obligated to file a consolidated return with Dana and the other members of the affiliated group. *See* I.R.C. § 1504(d) (1988). Thus, the obligation to file a consolidated return was in effect separate and apart from the tax sharing agreement.

But, beyond all that, if, as we have held, Diamond terminated the agreement and Cherokee acquiesced in the termination does that not end the obligation to pay Cherokee under the agreement—regardless of whether federal law requires them to file a consolidated return? The plaintiff argues that Diamond cannot terminate half the agreement and abide by the other half. We think, however, that the entire agreement was terminated even though federal law may require the parties to perform part of what the agreement called for.

## IV.

We think our holding with respect to the termination of the agreement disposes of the real issue in this case. It is arguable, however, that the claim based on the 1983 $6,500,-000 payment is not affected by the termination of the agreement in 1984.

The 1983 transaction was a purchase by Diamond of a builders risk policy from Cherokee. For a statement of the facts in the light most favorable to the plaintiff we copy from the plaintiff's brief:

Cherokee lost substantial money during the first three quarters of 1983. In the wake of these losses, Diamond and Cherokee wanted to increase Cherokee's reported income and to improve its loss ratio so that it could retain a favorable A.M. Best rating.

For this reason, Cherokee and Diamond created a transaction known as the "builder's risk" policy. Diamond agreed that Cherokee would issue a builder's risk insurance policy to Diamond as the named insured, for which Diamond paid Cherokee $6.5 million. The policy covered a period of only three months, from October 1983 through December 1983. The policy was not issued until November 14, 1983.

The policy provided insurance coverage in the face amount of $7.1 million to insure a building and machinery "to be occupied" by an operating division of Dana, Diamond's parent. The insured property was not acquired by the Dana division until December 6, 1983. Prior to that date, the property was owned by the contractor who was constructing the facility.

Construction was completed by November 22, 1983, which terminated the coverage under the policy. Thus, the facility was never owned by the Dana division during the time of the insurance coverage. Moreover, at the time that the builder's risk policy was issued, Dana had already purchased permanent insurance coverage for the facility.

The fair market cost of the builder's risk "premium" was no more than $2,827. Thus, Diamond paid Cherokee $6.5 million for three months of insurance coverage on a building that was already insured and that Dana/Diamond did not own or occupy at the time the insurance was in effect. This transaction was a sham. Its sole purpose was to inflate and distort Cherokee's income and loss ratios. (Citations to the record and footnote omitted).

To these facts we would add that the undisputed proof shows Cherokee represented to Diamond that the $6,500,000 payment was premium income and that it would be reported as premium income on Cherokee's financial statements. Also Cherokee explained the transaction to the Tennessee Department of Insurance and reported to Diamond that the transaction had been approved. Cherokee reported the payment as premium income and used the resulting financial statements to verify to Diamond the amount due under the tax agreement for the fourth quarter of 1983. Diamond paid the amount claimed.

■ Whether the transaction was a sham or not, so far as this record shows, it affected only the parties, Diamond and Cherokee. By it Cherokee received $6,500,000 instead of the lesser amount it would have received under the tax sharing agreement. If the parties, fully aware of their rights and obligations under the tax sharing agreement, chose to treat the payment as premium income, who has the right to attack that decision? We do not think Cherokee itself can attack it and the plaintiff, standing in Cherokee's shoes cannot attack it seven years later.

The judgment of the court below is affirmed and the cause is remanded to the Chancery Court of Davidson County for the collection of the costs accrued in that court. Tax the costs on appeal to the appellant.

TODD, P.J., and LEWIS, J., concur.