IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 16, 2004 Session

## CRYE-LEIKE, INC., ET AL. v.
## THE ESTATE OF KENNETH H. EARP, ET AL.

**Appeal from the Chancery Court for Sumner County**
**No. 2001C-142    Tom E. Gray, Chancellor**

_____

**No. M2003-00740-COA-R3-CV - Filed November 18, 2004**

_____

This case involves a dispute over whether a real estate listing contract was canceled by oral agreement prior to receipt of a full-priced offer from a buyer. Plaintiff real estate agents claim the contract was still in effect at the time of the offer entitling them to their sales commission when Defendant sellers refused to sell their property. The trial court found that the contract was canceled by oral agreement prior to receipt of the offer and dismissed Plaintiffs' complaint. Defendants counterclaimed for violations of the Tennessee Consumer Protection Act and the Tennessee Real Estate Broker's Licensing Act. Defendants counterclaims were also dismissed. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Arthur E. McClellan, Gallatin, Tennessee, for the appellants, Crye-Leike, Inc., Connie Reese and Charles Haynes.

Walter H. Stubbs, Gallatin, Tennessee, for the appellee, The Estate of Kenneth H. Earp, deceased and surviving spouse, Tina M. Earp.

### OPINION

Appellees, Ken and Tina Earp, owned a 380 acre farm known as the "Wallace Farm". After Mr. Earp was diagnosed with a terminal illness, he decided to sell this farm and contacted Hub Reese, a real estate agent he had used previously, to list his property. Unbeknownst to Mr. Earp, Mr. Reese was no longer licensed to sell real estate. His wife, Connie Reese, was licensed, and the two worked together in her real estate business with Hub Reese acting as her 'assistant'. Mr. and Mrs. Earp met with Connie and Hub Reese on October 17, 2000 and entered into a written contract with

Connie Reese and Crye-Leike Realty giving Connie Reese and Crye-Leike the exclusive right to sell their farm. The property was listed for $1,600,000. At no time did the Reeses inform the Earps that Hub Reese no longer held a real estate license, and Mr. Earp believed that the contract to sell the farm was with Hub Reese.

Approximately three months after the property was listed, the Earps received an offer from Henry Hollerman, an individual who had previously expressed an interest in purchasing the farm and who was specifically excluded from the contract with Connie Reese and Crye-Leike. Mr. Hollerman's offer for 1.5 million dollars was received by the Earps on the morning of January 25, 2001. After discussing the matter, the Earps decided they were no longer interested in selling the farm and contacted Hub Reese to inform them that they wished to take the property off the market. On that day, Connie Reese was sick in bed with the flu and unable to transact any business. Hub Reese informed Mr. Earp that he would need to contact Jan Page, the broker for Crye-Leike, to work out the details of withdrawing the property. Hub Reese then contacted Jan and discussed the situation with her. Mr. Earp subsequently spoke with Jan Page and was informed by her that the property could be withdrawn from the market provided Mr. Earp agreed to certain stipulations. Mr. Earp agreed to these stipulations, and Ms. Page stated that she would have her secretary, who was out of the office at that time, type up a written copy of their agreement and fax it to him for his signature. When Mr. Earp did not receive the written agreement within a few hours, he contacted Jan Page again to inquire about the document. He was, again, told by Ms. Page that her secretary was out of the office but that she would have the document typed and sent to him as soon as her secretary returned.

Later that afternoon, Hub Reese was contacted by another agent, Mr. Charles Haynes, and informed that there were buyers interested in the "Wallace Farm" and that a contract might be forthcoming from the buyers that day. Hub Reese informed Mr. Haynes that there might be some problems with selling the farm. As a result of this conversation, the buyers decided to present an offer for the full asking price, with no conditions. However, Hub Reese never informed Mr. Haynes that the Earps had decided to withdraw the property from the market. Later that evening, Mr. Haynes did present a contract for full asking price to Hub Reese and Jan Page. Mr. Reese and Ms. Page then met Mr. Earp at a restaurant at approximately eight o'clock in the evening to present this contract to him. Mr. Earp again informed Ms. Page and Mr. Reese that he was no longer interested in selling the property but ultimately agreed to take the buyer's contract home for consideration. A few days later, Mr. Earp returned the contract to Mr. Haynes' office with the word "rejected" written across the contract. No further action was taken by any party with regard to selling the farm or removing it officially from the market.

Crye-Leike, Connie Reese, and Charles Haynes, sued the Earps for breach of the sales Contract and requested the court to award the commission that they would have received from the sale. The Earps, who had by that time found out that Hub Reese was not licensed to sell real estate and not acting as their real estate agent, counterclaimed for violations of the Real Estate Broker's Licensing Act and the Consumer Protection Act.

After a full evidentiary hearing, the trial court dismissed all claims by both parties. The trial court, in a Memorandum, set out its detailed finding of facts. These findings of fact present a very thorough summary of the evidence presented by the parties and the basis for the trial court's decision.

1. Kenneth H. Earp and wife, Tina M. Earp, purchased from the estate of Dr. John Wallace, deceased, a farm consisting of approximately 379.589 acres known as the Wallace Farm.

2. On or about the 17th day of October, 2000 Kenneth Earp contacted Herbert (Hub) Reese, Jr., about listing the farm for sale. Kenneth Earp had utilized the services of Hub Reese, Jr., as a Tennessee licensed real estate agent in listing and selling real property owned by Kenneth Earp and wife, Tina Earp.

3. At the time of being contacted by Kenneth Earp on the 17th day of October, 2000, Hub Reese did not have an active real estate license. The wife, Connie, of Hub Reese held a license to sell real estate.

4. Kenneth Earp talked with Hub Reese about listing the Wallace Farm for sale.

5. Hub Reese and Connie Reese went to the home of Ken and Tina Earp. They went into the office of Ken Earp and discussed the Wallace Farm. Tina Earp was at home, but she did not remain in the office, and she did not participate in the discussion concerning the sale of the Wallace Farm.

6. Hub Reese and wife, Connie Reese, and Ken Earp drove out to the Wallace Farm and looked at the property, and further discussed listing the property for sale. After looking at the property they returned to the home of Ken Earp and continued to discuss the contract. Tina Earp did not participate in the discussion.

7. Connie Reese filled in the blanks on a pre-printed form for listing the Wallace Farm for sale. On the form there were also printed the names of three persons who were excluded by Ken Earp from the Reese's receiving a commission if the property were sold to either one of those persons.

8. Neither Connie Reese nor Hub Reese informed Ken Earp that Hub Reese did not hold a license to sell real estate and that he was acting as an assistant to his wife, Connie Reese.

9. Ken Earp asked about taking the property off of the market before the listing agreement expired and Connie Reese replied, "Call us".

10. Upon completion of the listing agreement, it was signed on the 17th day of October, 2000 by Kenneth H. Earp, Tina M. Earp, and Connie Reese.

11. The listing contract gave the right to Crye-Leike, Inc. to have the exclusive right to sell the real property for a period of six months.

The Earps agreed to pay Crye-Leike, Inc. five (5%) percent commission on the gross selling price.

12. At the request of Ken Earp no sign was placed on the Wallace Farm giving notice to the general public that the farm was for sale. Crye-Leike has expended no funds advertising the Wallace Farm for sale. No evidence exist as to any funds expended by Connie Reese or Hub Reese in advertising the property.

13. On the morning of the 25th day of January, 2001 Henry Holliman, one of the persons exempt from commission under the contract, went to the home of Ken and Tina Earp and made an offer to purchase the Wallace Farm for 1.5 million dollars. The offer was not accepted. Ken and Tina Earp discussed the farm and decided that they wanted to take if off the market.

14. At approximately 9:30 a.m. on the 25th day of January, 2001, Ken Earp called Hub Reese and informed him that he wanted to take the property (Wallace Farm) off the market. Hub Reese informed Ken Earp that Connie Reese was in bed sick and that he would see what he could do. In a subsequent phone conversation that morning Hub Reese informed Ken Earp that this matter would have to be handled by Crye-Leike. Ken Earp objected saying that he didn't make the listing with Crye-Leike but with the Reeses. Hub Reese informed Ken Earp that he had to call Jan Page at Crye-Leike.

15. Ken Earp called Jan Page at Crye-Leike Realtors and discussed the matter of taking the property off the market.

16. After discussion with Ken Earp, Jan Page informed Ken Earp that the property could be taken off the market under certain stipulations. Ken Earp agreed to all of the stipulations offered by Jan Page. Jan Page informed Ken Earp that her secretary was not in at the time and a writing would be forthcoming. It was to be faxed to Ken Earp. When the writing didn't arrive timely Ken Earp called Jan Page again on January 25 and asked about the writing, and he was informed that the secretary had not yet returned.

17. On the afternoon of the 25th day of January, 2001, Hub Reese received a telephone call on his cell phone from Charles Haynes, a realtor, who informed Hub Reese that he wanted to discuss an offer on the Wallace Farm.

18. Hub Reese went to the office of Charles Haynes who indicated that he was probably going to have an offer from prospective buyers on the Wallace Farm. Hub Reese did not inform Charles Haynes that Ken Earp had taken the property off the market. He did state that there was some controversy concerning the property. As a result of the statements of Hub Reese, the prospective buyers decided that they would make their offer at the full listing price and with no conditions.

19. Hub Reese notified Jan Page that Charles Haynes had an offer to make and she and Hub Reese met Charles Haynes at his office at approximately 6:00 p.m. on the 25th day of January, 2001.

20. After Charles Haynes presented the written offer, Hub Reese telephoned Ken Earp and asked for a meeting and Ken Earp agreed to meet them at the Cattlemen's Restaurant in Gallatin at approximately 8:00 p.m. on the 25th day of January, 2001.

21. The meeting at the Cattlemen's Restaurant on the 25th day of January, 2001 took place with Hub Reese, Jan Page and Ken Earp.

22. The offer to purchase was presented to Ken Earp on the 25th day of January, 2001 at the Cattlemen's Restaurant, and he stated a rejection in that he had taken the property off the market. After some discussion, he was persuaded to take the written offer home with him and to give it further consideration.

23. Subsequent to the 25th day of January, 2001 the contract was returned rejected and signed by Ken Earp. Tina Earp did not sign the rejection.

24. The complaint in this matter was filed on the 25th day of April, 2001 and as of that date the Wallace Farm had not been sold by the Earps.

As further facts in this matter the Court states that Tina Earp did not notify Hub Reese or Connie Reese or Jan Page that she was cancelling the listing contract and as stated above she did not sign off on the rejection on the contract presented.

At the trial of this matter on the 10th day of February, 2003, Jan Page testified that she did not have an agreement to cancel the listing contract. The Court finds that she did not have a written agreement. She had agreed with Mr. Earp to cancel the listing agreement. In the deposition of Jan Page taken on the 31st day of July, 2001 she testified as follows:

Q. Okay. Okay. On January 25th, 2001, what do you recall was, I guess, your first information or knowledge about this listing or property?

A. Sometime - - I can't even put a time. Sometime during the day Hub called me and said that the Earps wanted out of the listing.

Q. Uh-huh.

A. And he told me which one. I said fine. He said Connie was sick, deathly ill in bed, and just could not even come to the phone.

Q. Uh-huh.

A. That was his conversation. And I said, okay, Hub, you know, what does she want to do. And he said, you know, gosh, it's been on the market for I don't know how many months at this point, nothing has

happened much, you know. I said, well, it is up to you as to what you want to do, you meaning you all, with the listing, that is not my decision to make.

Q. Uh-huh.

A. I said, I would recommend that if you do, that there should be some stipulations - -

Q. Uh-huh.

A. - - just don't blanket - - because somebody wants out of a listing, you know, let them out, there have to be stipulations.

Q. Okay.

A. - - and those are my recommendations. He said fine. Then I think he must have called Ken. Ken called me. And I said, there are stipulations, but we'll let you out of the listing - -

Q. Uh-huh.

A. - - one, you cannot sell it to anybody during the time of our listing or anybody that has seen it for - - I think it was a hundred and eighty - - it might have been ninety - - our contract has changed and I don't recall - - after the listing, for ninety days after the listing-

Q. Okay.

A. - - that and you can't list with another company - -

Q. Uh-huh.

A. - - until our listing would have expired.

Q. Okay. And - -

A. And he said fine. He said, you know, fax it over to me.

Q. Okay.

A. And I said, I can't have it drawn up, my secretary is in a meeting in Brentwood - -

Q. Uh-huh.

A. - - you know, we'll get it back to you as soon as we can.

Q. Uh-huh.

A. And she didn't show up until close to five o'clock from the meeting in Brentwood.

Q. Do you recall hm calling you back - -

A. He did.

Q. - - and saying, where is it, and you said, she's still not back?

A. And that's when I told him, she's still not here.

Q. Okay.

A. And that's pretty much it.

Q. But you didn't have a problem with him doing it, as long as there were these stipulations, as you say.

A. Right.

Q. And that's what you indicated to him.

A. Uh-huh.

Q. And that's what the Reeses indicated.
A. Uh-huh.
Q. Is that right?
A. Uh-huh.

In this matter the Court finds that there existed an agency relationship between the Earps and Connie Reese and Crye-Leike. By agreement, the principal/agency relationship came to an end when Mr. Earp requested to take the property off the market and Crye-Leike and Connie Reese agreed. Principal/agency relationship may be established by oral agreement. The relationship may be terminated orally.

Paragraph 23 of Exhibit 1, the listing agreement, provides as follows:

The parties agree that this contract constitutes their entire agreement and that no oral or implied agreement exist. Any amendments to this agreement shall be made in writing, signed by both parties, and shall be attached to this original agreement and all other copies hereof.

There were no amendments to the agreement. Mr. Earp had asked prior to the execution of the agreement concerning taking the property off the market and the response was "Call us". He did that. He then followed the directions of the agent's assistant, Mr. Reese, to call Jan Page. He received an agreement that the property could be taken off the property with certain stipulations. He agreed to all of the stipulations. Ms. Page told Mr. Earp that when her secretary returned the paper work would be typed up and sent to him. She did not ask that he write it up and send to her.

It was an oral agreement to rescind the contract. The Court finds that this is not in contradiction to Tennessee law. The statute of frauds does not require a listing agreement to be in writing. In this case the listing was in writing and was for a definite time.

In this case the recision was clearly expressed and clearly accepted. . . .

. . . .

At the time that Jan Page informed Ken Earp that he was let out of the listing agreement neither she nor Connie Reese or Hub Reese were aware that an offer was going to be made that day. No

third party rights, if any, had come into being when Ken Earp took the property off the market with consent of the listing agent and the broker.

. . . .

From the evidence in this case it is clear that there was agreement by Jan Page and Connie Reese to let Ken Earp and Tina Earp with stipulations out of the listing agreement of the Wallace Farm. Based upon the facts in this case the lack of writing terminating with stipulations the listing agreement is considered by the Court to be of no consequence. It was clear there was mutual consent to terminate the contract with the agent setting forth stipulations to which Ken Earp agreed.

Appellant, Crye-Leike, Connie Reese, and Charles Haynes, allege that the trial court erred in finding that the parties mutually consented to terminate the listing contract. It is their contention that the contract could only be modified in writing, and since no written agreement was ever executed, the listing agreement was in effect at the time Mr. Earp received the full price offer, thus, requiring the Earps to sell the farm. The appellees, Ken and Tina Earp, also present several issues for review: (1) "Whether the trial court erred in finding that the appellants did not violate the Real Estate Broker's Licensing Act and the Consumer Protection Act." (2) "Whether the claims of Appellant Charles Haynes were properly dismissed in any event because there was no contractual relationship between the Earps and Haynes." (3) "Whether Appellee's actions did not constitute a breach of contract in any event because the appellant's failed to produce a buyer who was ready, willing, and able to perform."

We find that the parties made an oral agreement to terminate the listing contract; thus, terminating the Earps' contract with Connie Reese and Crye-Leike on the morning of January 25, 2001. We also agree with the trial court that Appellant's claims for violation of the Real Estate Broker's Licensing Act and the Consumer Protection Act were properly dismissed.

This matter will be reviewed *de novo* upon the record of the trial court, accompanied by a presumption of correctness with regard to the chancellor's findings of fact unless a preponderance of the evidence shows otherwise. Tenn. R. App. P. 13(d). The trial court's legal determinations are reviewed *de novo* without any such presumption. *Bank v. Trailkill*, 856 S.W.2d150 (Tenn.Ct.App. 1993). Further, the trial court's determination with regard to credibility of the witnesses and the weight of oral testimony are given considerable deference, as only the trial court has the opportunity to see and hear the witnesses. *See Galbreath v. Harris*, 811 S.W.2d 88 (Tenn.Ct.App. 1990).

In Tennessee, it has long been held that a contract may be rescinded with the mutual consent and agreement of the parties. *Wright v. Fischer*, 148 S.W.2d 49, 53 (Tenn.Ct.App. 1940). Tennessee law also "requires that the termination of a contract by mutual consent of both parties be

positive, clear, and unambiguous, conveying an unquestioned purpose to terminate the contract." *Russom v. Ins. Co. of N. Am.*, 421 F.2d 985, 993 (6th Cir. 1970). Furthermore, this agreement to rescind a contract may be an oral agreement. In *Tidwell v. Morgan Bld. Sys., Inc.*, 840 S.W.2d 373, 376 (Tenn.Ct.App. 1992), the parties made a contract for the purchase of a metal building and, subsequently, orally agree upon a larger building. Said the court:

> The original contract, signed by the parties, provided that it could only be modified in writing. There is no dispute between the parties that they subsequently agreed upon a larger building at an increased purchase price. . . . We believe that the evidence is clear that the parties mutually agreed to rescind the first contract. As we interpret the written agreement and T.C.A. § 47-50-112, neither prohibits the parties from rescinding a written agreement by mutual oral agreement . . . While rescission must be clearly expressed, the acts and conduct of the parties may also be sufficient to effect the mutual rescission where the acts and conduct are positive, unequivocal, and inconsistent with the contract's existence. *Arkansas Dailies, Inc. v. Dan*, 36 Tenn. App. 663, 671, 260 S.W.2d 200, 203 (1953).

Oral agreements between a seller and a real estate agent have, also, been specifically held valid in the State of Tennessee. *See Parks v. Morris*, 914 S.W.2d 545 (Tenn.Ct.App. 1995).

Neither the Parol Evidence Rule nor the Statute of Frauds is applicable when an oral agreement to rescind is established by clear and convincing evidence. In this case the evidence is practically undisputed. This Court has held: "We know of no requirement of the Statute of Frauds, Parol Evidence Rule, or other rule of law that prohibits the oral rescission, cancellation, destruction or abandonment of a written contract for the sale of land." *Walker v. Wood*, 213 S.W.2d 523, 526 (Tenn.Ct.App. 1948); *see also Early v. Street*, 241 S.W.2d 531 (Tenn. 1951); *McIntosh v. Goodwin*, 292 S.W.2d 242 (Tenn.Ct.App. 1954). The only exception to such a rule involves cases where the rights of third parties have intervened. *See Wright v. Fischer*, 148 S.W.2d at 53. In this case, the rescission agreement was completed prior to the time of the Charles Haynes' offer.

Observing that only Texas adopts a contrary rule, Williston on Contracts, quoting *West River Equipment Co. v. Holzworth Construction Co.*, 335 P.2d 298 (Mont. 1959), asserts:

> "The parties to the executory written agreement were privileged to terminate it at any time by mutual consent independently of any express agreement so providing and it is immaterial whether such termination be characterized an abandonment, cancellation, mutual rescission or waiver. The effect is the same--to relieve the parties from going forward under the written instrument, and this may be accomplished by parol, *and the fact of its having been done established by evidence of the acts and declarations of the parties*. . . .
> "There can be no question but what a contract may be mutually abandoned or modified by the parties at any stage of performance, and each of the parties released from further obligation on account thereof; that it may be accomplished by

parol, and the fact of its having been done established by evidence of the acts and declaration of the parties.

"It is clear then that a written contract may be canceled by mutual consent . . . and that the cancellation may be oral. . . .

"The statute of frauds does not preclude oral rescission of a prior written contract that is within the statute. . . ."

Richard A. Lord, Williston on Contracts § 29:43 (4th ed. 1999).

In reviewing the testimony and other evidence presented in this case, we do not see that the evidence preponderates against the trial court's findings of fact. In applying the law to the facts of this case, we agree with the trial court that, through the course of telephone conversations between Ken Earp, Hub Reese, and Jan Page, on the morning of January 25, 2001, Ken Earp entered into an oral agreement cancelling the listing contract with Connie Reese and Crye-Leike Realty, removing the farm from the sales' market. By Jan Page's own testimony, the acts of the parties to rescind the agreement were positive, unequivocal, and inconsistent with the contract's existence.

Although Connie Reese, due to illness, was not able to participate in the conversations with Jan Page and Ken Earp, the evidence makes it clear that Hub Reese was acting as her agent, as he had done so continuously with regard to their dealings with the Earps. The law in Tennessee with regard to agency can be found in *Rural Education Association v. Bush*, 298 S.W.2d 761, 766 (Tenn.Ct.App. 1956).

Agency may be proved by circumstances and by evidence of the conduct of the parties. *Hammond v. Herbert Hood Company*, 31 Tenn. App. 683, 221 S.W.2d 98. What agent did with knowledge and approval of his principal is circumstantial evidence of what agent was authorized to do. *Boillin-Harrison Company v. Lewis & Company*, 182 Tenn. 342, 187 S.W.2d 17.

Burden of proof is on person attempting to establish an agency, that alleged agent was in fact the agent of the alleged principal and was authorized to do the act done. *Cobble v. Langford*, 190 Tenn. 385, 230 S.W.2d 194.

Whether an agency has been created is to be determined by the relations of the parties as the relations in fact exist under their agreements or acts, whether the parties understand that there is an agency or not. *Smith v. Tennessee Coach Company*, 183 Tenn. 676, 194 S.W.2d 867.

A principal is bound if an agent acts within his apparent or ostensible authority. *McCoy v. Willis*, 177 Tenn. 36, 145 S.W.2d 1020.

Our Supreme Court approved this statement of the rule of 'Apparent or Ostensible Authority,' *Southern Railway Company v. Pickle*, 138 Tenn. 238, 197 S.W. 675, 677:

'Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such

authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Ostensible authority is such authority as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess, and in some jurisdictions it is so defined by statute. Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential to the application of the above general rule that two important facts be clearly established; (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority.'

*See also Rich Printing Company v. Estate of McKellar*, 330 S.W.2d 361 (Tenn.Ct.App. 1959).

The facts of this case make it clear that Hub Reese was acting as Connie Reese's agent in this matter. The Reeses admitted that Hub Reese was acting as Connie Reese's assistant throughout their dealings with the Earps. Further, Hub Reese had previously held a real estate license and worked with Mr. Earp in that capacity in the past, and Mr. Earp had no reason to believe that Hub Reese was not acting as his sales agent at this time. Mr. Earp communicated primarily with Hub Reese, was never informed by the Reeses that Hub Reese was no longer licensed to sell real estate and merely acting as Connie Reese's assistant, and believed Hub Reese to be his real estate agent when he discussed canceling the contract with Hub Reese. Thus, Mr. Earp had reason to believe Hub Reese had authority to act, and, Mr. Earp acted in good faith on that belief when he discussed canceling the contract with Hub Reese. Connie Reese was aware of Hub Reese's communications with Mr. Earp and knew of their past dealings and relationship. Connie Reese intentionally held Hub Reese out as her agent thus capitalizing on the past relationship between Hub Reese and Mr. Earp. Further, on the morning of January 25, 2001, Connie Reese was aware that Hub Reese was speaking on her behalf.

The Plaintiffs have also tried to make an issue out of Tina Earp's lack of involvement in rejecting the full price offer and canceling the listing contract, claiming that the buyers' contract must be presented to and rejected by both parties and that Ms. Earp never requested the listing contract be canceled. After Ken Earp returned from his meeting with Hub Reese and Jan Page, he failed to show the offer to his wife or discuss the matter with her. When the buyer's contract was sent back rejected, this rejection was only signed by Ken Earp. Also, only Mr. Earp notified Hub Reese and Jan Page that he wanted to cancel the listing contract. However, in both situations, Ken Earp was acting as Tina Earp's agent with regard to the property. From the beginning of the Earps' dealings with Crye-Leike and the Reeses with regard to the sale of the farm, Ms. Earp was only a cursory part of the discussions and decisions being made and gladly allowed her husband to act on her behalf, merely signing contracts when he requested this of her. The Earps had, earlier that day, discussed

taking the property off the market and had determined that they did not want to sell the property at all. Even upon finding out about the full price offer and Mr. Earp's rejection of that offer, Ms. Earp was in agreement with Mr. Earp's rejection of the contract and understood him to be acting on her behalf.

The Earps have also alleged violation of the Tennessee Real Estate Broker's Licensing Act on the part of Hub Reese, Connie Reese and Crye-Leike. Particularly with regard to Tennessee Code Annotated sections 62-13-301, 62-13-102(3)(A), 62-13-103, 62-13-318(a)(4), 62-13-302, it is alleged that Hub Reese engaged in activities which are prohibited to anyone without a valid real estate license. Also, with regard to Connie Reese, as agent of Crye-Leike, Plaintiffs allege violations through misrepresentation, fraudulent inducement to sign the real estate Contract, and false advertising.

Although, based on past dealings with Hub Reese, it is understandable that Ken Earp may have believed his property was being listed with Hub Reese, the evidence shows no actual misrepresentation on the part of the Reeses. The contract signed by Mr. and Ms. Earp specifically states that the farm is being listed with Connie Reese, not Hub Reese. This contract was completely filled out by Connie Reese in her handwriting and signed by Connie Reese only. As there was no advertising undertaken by anyone to sell the property, other than a routine placing of the property on the Multiple Listing Service as Connie Reeses's listing, and no offers to purchase the property, other than the one received after the contract was canceled and now involved in this action, it cannot be said that the Reeses undertook any activity in violation of the Tennessee Real Estate Broker's Licensing Act. Furthermore, as we find that the property was listed from October 17, 2000 through January 25, 2001 with absolutely no sales or marketing activity of any kind and that the parties to the contract agreed to terminate the contract and remove the listing from the market prior to any offer being received through the Reeses or Crye-Leike, the Earps have no damages from any alleged violations by Connie and Hub Reese or Crye-Leike.

Likewise, with regard to violations of the Tennessee Consumer Protection Act, other than meeting with Mr. and Ms. Earp and signing a contract between Mr. and Ms. Earp and Connie Reese to allow Connie Reese and Crye-Leike Realtors to sell the farm, there was no further activity on the part of Connie or Hub Reese in attempt to sell or market the farm. As such, it cannot be said that either Connie or Hub Reese engaged in any act in violation of the Tennessee Consumer Protection Act. As we have found that the contract was terminated on the morning of January 25, 2001, with no action being taken with regard to sale or marketing of the property, we again find that the Earps have no damages for any alleged "unfair or deceptive practice" on the part of Hub or Connie Reese.

The judgment of the trial court is in all respects affirmed and the case is remanded to the trial court for such further proceedings as may be necessary.

Costs are assessed against Appellants.

_____
WILLIAM B. CAIN, JUDGE